M.D.[1] vs. DEPARTMENT OF DEVELOPMENTAL SERVICES[2]
& another.[3]

No. 12-P-241.

Middlesex. September 18, 2012. - April 1, 2013.

Present: BERRY, BROWN, & AGNES, JJ.

*Department of Developmental Services. Intellectually Disabled Person.
Administrative Law,* Hearing, Agency's interpretation of statute, Substantial
evidence. *Notice.*

At a hearing challenging the proposed transfer of the plaintiff from an intermedi-
ate care facility for intellectually disabled persons to another such facility, an
administrative magistrate in the Division of Administrative Law Appeals did
not err in declining to consider whether the Department of Developmental
Services (department) violated Federal law in making its decision to transfer
the plaintiff, where Federal case law did not stand for the proposition that
the plaintiff could reject any undesired transfer, and where there was no
merit to the claim that the department had violated Federal law by denying
the plaintiff the opportunity to live in an appropriate home. [466-468]

There was no merit to the claim that, in proposing the transfer of the plaintiff
from an intermediate care facility for intellectually disabled persons to
another such facility, the Department of Developmental Services failed to
comply with the certification requirement set forth in *Ricci* v. *Okin,* 823
F. Supp. 984 (D. Mass. 1993), where that requirement does not apply to an
interinstitutional transfer; and where, even assuming that certification was
required, there was no showing of prejudice to the plaintiff. [468-470]

Although, in proposing the transfer of the plaintiff from an intermediate care
facility for intellectually disabled persons to another such facility, the
notice sent by the Department of Developmental Services (department)
was defective, there was no evidence that, as a result, the ability of the
plaintiff's guardians to prepare their case was compromised, where the
department cured any defect in writing before an administrative hearing on
the proposed transfer. [470-473]

[1]By her coguardians, Regina and Albert Davidson.

[2]Effective June 30, 2009, the Department of Mental Retardation's name
was changed to the Department of Developmental Services (DDS) in order to
eliminate use of the word "retardation." See G. L. c. 19B, § 1, as amended
through St. 2008, c. 182, §§ 9, 115, and St. 2008, c. 451, §§ 28, 184. See
also *Tartarini* v. *Department of Mental Retardation,* 82 Mass. App. Ct. 217,
217 n.1 (2012) (noting the replacement of all references in G. L. c. 123B to
"mental retardation" with the words "intellectual disability").

[3]Division of Administrative Law Appeals.

Substantial evidence supported the determination by an administrative magistrate in the Division of Administrative Law Appeals that the proposed transfer of the plaintiff from an intermediate care facility for intellectually disabled persons to another such facility was in the plaintiff's best interest, where the magistrate gave careful consideration to the objections raised by the plaintiff's guardians and to the evidence presented by the Department of Developmental Services, and where the magistrate carefully considered the advantages of the facility to which the plaintiff would be transferred. [473-474]

There was no merit to the claim that, in proposing the transfer of the plaintiff from an intermediate care facility for intellectually disabled persons, the Department of Developmental Services made its decision before a modification meeting, without the involvement of the plaintiff's guardians. [474-476]

This court declined to reach an issue raised for the first time at oral argument on appeal. [476-477]

CIVIL ACTION commenced in the Superior Court Department on March 25, 2011.

The case was heard by *Daniel M. Wrenn*, J., on a motion for judgment on the pleadings.

*Stephen Michael Sheehy* for the plaintiff.

*Timothy J. Casey*, Assistant Attorney General, for the defendants.

BROWN, J. The Fernald Developmental Center (FDC) will be closing as an Intermediate Care Facility for Persons with Mental Retardation (ICF). This policy decision removing a group of intellectually disabled individuals from that facility is no longer subject to review by the Federal courts.[4]

Born in 1943, M.D. is moderately intellectually disabled and suffers from severe mental illness. She is one of the last fourteen

---

[4]To promote compliance with *Olmstead* v. *L.C. ex rel. Zimring*, 527 U.S. 581 (1999), and to further the Commonwealth's own policies favoring the reduction of institutional capacity and the provision of services in less restrictive settings, the Legislature passed three acts between 2004 and 2007, specifically directing the then Department of Mental Retardation (DMR) to consolidate or to close its six ICFs. See *Ricci* v. *Patrick*, 544 F.3d 8, 12 (1st Cir. 2008), cert. denied, 556 U.S. 1166 (2009) (*Ricci V*), reversing 499 F. Supp. 2d 89 (D. Mass. 2007). In order to comply with this legislative mandate, DMR opted to keep two ICFs (the Wrentham Developmental Center [WDC] and the Hogan Regional Center in Danvers) open and to develop a number of new community-based settings for the residents displaced by the closures. Before this legislation (in 2003), the Governor had announced the decision to close FDC — by far the most costly of the ICFs to run and the most seriously noncompliant with the Americans with Disabilities Act of 1990 (ADA).

residents of FDC, where she has lived since 1985. At FDC, M.D. receives services and supports in accordance with the individual service plan (ISP) developed by her team.[5] On May 28, 2010, the Department of Developmental Services (DDS) gave notice to M.D.'s guardians of its intentions to transfer her from FDC to the Wrentham Developmental Center (WDC), another ICF in the Commonwealth. This notice is required by G. L. c. 123B, § 3, inserted by St. 1986, c. 599, § 39 (transfer statute). Under the statute, M.D.'s guardians had forty-five days to object to the proposed transfer. The guardians objected, and DDS then referred the case to the Division of Administrative Law Appeals (DALA) for a hearing, in accordance with the statute. An evidentiary hearing was held before an administrative magistrate, who issued a decision that included detailed findings of fact. The administrative magistrate concluded that the transfer of M.D. to the WDC would result in improved services and quality of life and was in her best interest. The guardians then appealed the DALA decision in Superior Court. Review in that court was under G. L. c. 30A, § 14(7). The judge upheld DALA's decision, and this appeal followed.

This case involves the procedural schemes and safeguards associated with the transfer statute. For the reasons that follow, we hold that (1) the magistrate appropriately declined to consider Federal law issues beyond the scope of an appeal from a transfer decision; (2) the certification requirement set forth in *Ricci* v. *Okin*, 823 F. Supp. 984 (D. Mass. 1993) (*Ricci III*), does not apply to an interinstitutional transfer; (3) any defects in the statutory transfer notice did not constitute prejudicial error; and (4) the magistrate's decision that the transfer to WDC would result in improved services and quality of life for M.D., and thus be in her best interest, was supported by substantial evidence. Accordingly, we affirm.

---

[5]ISP stands for "individual service plan" under G. L. c. 123B, § 3, and "individual support plan" under 115 Code Mass. Regs. § 6.20(4) (2009); both are referred to interchangeably as "ISP." See *Molly A.* v. *Commissioner of the Dept. of Mental Retardation*, 69 Mass. App. Ct. 267, 277 n.17 (2007). The ISP team members include the disabled individual, members of her family, the guardians, the human services coordinator, those that provide the daily supports to the individual, and the friends and representative of the individual. See 115 Code Mass. Regs. § 6.21(1) (2009). The team can be quite large. Only one ISP team remains at FDC.

*Refusal to consider Federal law issues.* We first determine whether the administrative magistrate erred by refusing to consider whether DDS violated Federal law, including the public services portion (Title II) of the Americans with Disabilities Act of 1990 (ADA), in making its decision to transfer M.D.

The administrative magistrate of DALA, an independent adjudicatory agency, properly read G. L. c. 123B, § 3, narrowly to limit his authority to determine whether the proposed transfer should proceed as in the best interest of M.D. See *Box Pond Assn.* v. *Energy Facilities Siting Bd.*, 435 Mass. 408, 416 (2001) (an agency's interpretation of its statutory mandate will not be disturbed unless it is "patently wrong, unreasonable, arbitrary, whimsical, or capricious" [citation omitted]). If the Legislature had intended for DALA to consider the guardians' Federal law claims in the context of a transfer proceeding, it would have included appropriate language to this effect in the statute. Compare, e.g., the broad grant of jurisdiction in G. L. c. 239, § 8A (giving residential tenants in certain summary process proceedings the right to raise any tenancy-related violation of law as a defense or counterclaim).

On appeal, M.D.'s guardians (her brother, Albert, and her sister-in-law, Regina Davidson) disclaimed any intention to raise a claim for relief under the ADA. Rather, they maintain that what they seek is compliance by DDS with the ADA as "a necessary condition to any action it may undertake." Even assuming DALA had jurisdiction to consider compliance issues, the guardians' amorphous Federal law claims lack merit.

First, the guardians seem to attempt to bring a claim under the United States Supreme Court case of *Olmstead* v. *L.C. ex rel. Zimring*, 527 U.S. 581 (1999) (*Olmstead*). In *Olmstead*, the Supreme Court, confirming that unjustified segregation is a form of disability discrimination, held that in certain circumstances, States were required by the ADA to place intellectually disabled individuals in community settings rather than in institutions. Specifically, the Court sought to "confront the question whether the proscription of discrimination may require placement of persons with disabilities in community settings rather than in institutions. The answer, we hold, is a qualified yes." *Id.* at 587. See *id.* at 596-597. The decision reflected the

modern trend favoring the mainstreaming of the disabled into society.

Here, the guardians twist *Olmstead* to stand for the proposition that M.D. can reject *any* undesired transfer. That interpretation is not correct. In *Olmstead*, the Court recognized that nothing in the ADA required the transfer of certain intellectually disabled individuals from an institution to a less protective community placement when it would be inappropriate. *Id.* at 601. The Court emphasized that no principle of Federal law *required* involuntary transfers out of institutions into the community. See *id.* at 601-602. Here, DDS is not attempting to send M.D. into the community or to keep her in an ICF against the wishes of her guardians. In short, the holding of the case has no real application to interinstitutional transfers.

Second, relying on the "least restrictive" setting language of *Olmstead*, see *id.* at 599, the guardians argue that DDS is violating the ADA by denying M.D. the opportunity to live in an "appropriate" home[6] (which they identify as FDC's Malone Park, which they would like to have maintained postclosure as an ICF; see note 23, *infra*). See 42 U.S.C. § 12132 (Title II's nondiscrimination provision). Where, as here, DDS offered M.D. placement in *less* restrictive settings (community-based group homes), this claim is fundamentally flawed. The Court in *Olmstead* observed that "[t]he ADA stepped up earlier opportunities for people with developmental disabilities to enjoy the benefits of community living." *Id.* at 599. The claim would also appear to be foreclosed by *Ricci* v. *Patrick*, 544 F.3d 8, 12 (1st Cir. 2008), cert. denied, 556 U.S. 1166 (2009) (*Ricci V*).[7] In that case, the United States Court of Appeals for the First Circuit ruled that the disengagement order did not guarantee to any *Ricci* class member[8] a particular residential placement or

---

[6]The regulations define "home" as "the house, apartment, or other place in which the individual lives *in the community*" (emphasis added). 115 Code Mass. Regs. § 7.02 (2009).

[7]The same may be said of the guardians' general challenge to the agency's discretionary decisions relating to the closure of FDC and the allocation of its resources. See *Ricci V, supra* at 17-18 & n.8.

[8]As a *Ricci* class member, see *Ricci III, supra* at 987 n.1, M.D. is entitled to all the protections afforded by the disengagement order, which closed the Federal reform litigation, returned authority to DDS to manage and oversee

that FDC must be maintained by DDS as long as any particular resident preferred to remain there. See *id.* at 19.

*Certification requirement.* Next, we consider whether DDS failed to comply with the certification requirement of the *Ricci III* disengagement order. In the G. L. c. 30A appeal, DDS, pressing a plain language construction of the order, argued that the certification requirement[9] was *inapplicable* to an interinstitutional transfer. The Superior Court judge agreed with DDS's position.

In its 2008 decision, the First Circuit chose to treat the terms of the parties' 1993 final consent decree (adopted in the disengagement order) as a contract involving questions of law that the court reviews de novo. See *Ricci V, supra* at 17-18. Following suit here, we conclude, as did the Superior Court judge, that the unambiguous language of the order does not cover this type of interinstitutional transfer.[10] The attorneys who crafted the consent decree were sophisticated attorneys who had dealt with each other for years; if they had wanted to include transfers

---

the State facilities, and adopted the parties' final consent decree. Paragraph 4 of that order provided: "Defendants shall not approve a transfer of any class member out of a state school [ICF] *into the community, or from one community residence to another such residence,* until and unless the Superintendent of the transferring school [ICF] (or the Regional Director of the pertinent community region) certifies that the individual to be transferred will receive *equal or better services* to meet their needs in the new location, and that all ISP-recommended services for the individual's current needs as identified in the ISP are available at the new location" (emphasis added). *Ricci III, supra* at 987. By 2010, the position of superintendent no longer existed, and State schools were designated as facilities. See 115 Code Mass. Regs. § 2.01 (2009) ("Facility"). The successor position is denominated as the FDC facilities director (a position held at all relevant times by Linda Montminy).

[9]A puzzling aspect of M.D.'s case is that the record established that a certification using the required language seems to have been made by DDS on June 23, 2010, as part of its "*Ricci* class member change of home address form." That certification was signed by Diane Enochs, the former DDS assistant commissioner for facilities management (and facility director Linda Montminy's boss). Neither party addressed that certification.

[10]The guardians' historical explanation for the absence of language covering facility-to-facility transfers falls flat. They claim that in 1993, no one was contemplating the closure of ICF facilities like FDC. That is incorrect. An earlier round of ICF consolidations and closures began in 1991. See *Ricci v. Okin,* 781 F. Supp. 826, 827-829 (D. Mass. 1992) (describing the Governor's consolidation plan that included the closure of the Dever State School); *Ricci V, supra* at 18 (noting the closure of the Dever State School in 1992 and the Belchertown State School in 2002).

between ICFs in the consent decree that was incorporated in the disengagement order, they could have done so. They did not.

In any event, even if a certification was required and DDS's certification here was inadequate, we discern no prejudice at this point. In short, based upon our review of the entire administrative record, the magistrate's decision that the transfer to WDC would result in improved services and quality of life for M.D., and thus be in her best interest, was supported by substantial evidence. See G. L. c. 123B, § 3. See also the discussion of substantial evidence, *infra*. Predating the disengagement order, the State standard applied by the magistrate was more stringent than the "equal or better" standard required by the disengagement order.[11]

The guardians claim that the lack of a certification by facility director Linda Montminy prejudiced their ability to question the "decision-maker" as to the reasons for the transfer. However, before the hearing in M.D.'s case, the identities of the decision-makers and the reasons for the transfer were disclosed to them. In its prehearing answers to interrogatories signed by Montminy, DDS indicated that M.D.'s *ISP team* made the recommendation based on a number of factors, including the guardians' preference for ICF-level services. The answers revealed other details regarding the transfer process and the parties involved in it.[12] The guardians also knew from direct correspondence from Diane Enochs, the former DDS assistant commissioner for facilities management, as well as from conversations with Wendy Smith, M.D.'s qualified mental retardation professional, or "Q," of Enochs's involvement in the transfer decision. Smith, who had served as M.D.'s human services coordinator and Q for six years, had initiated the ISP modification as permitted by DDS regulation, see 115 Code Mass. Regs.

---

[11]A transfer that results in equal services passes muster under *Ricci*, but does not meet the standard set forth in G. L. c. 123B, § 3.

[12]At the hearing, Gale Conley, the FDC placement coordinator, testified that she worked with M.D.'s ISP team to gather information and to get feedback on potential placements and M.D.'s needs. According to Conley, the team looked at both Hogan Regional Center and WDC for M.D. The clinical team selected the particular apartment at Heffron Hall A for M.D. in part because she could live with her former housemate from FDC and be taken care of by thirty-nine former direct care workers from FDC, some familiar to M.D. In July, 2010, Conley became the unit director of WDC's Heffron Halls.

§ 6.25(3)(c) (2009); had prepared a proposed ITP (individual transition plan); and had given an overview of M.D. at the ITP/ISP modification meeting.[13] At the DALA hearing, the guardians raised no objection to the absence of Enochs and Montminy, and they decided not to call Smith, who was on their witness list.

*Transfer notice.* Next we address whether the May 28, 2010, statutory transfer notice was defective and, if so, in the words of c. 30A, whether the agency decision was made upon unlawful procedure potentially prejudicing substantial rights. See G. L. c. 30A, § 14(7)(*d*).

General Laws c. 123B, § 3, requires several informational elements to be included in the request for consent, including, as herein relevant, a statement about "how the proposed residential transfer from the current facility to the proposed residential facility will result in improved services and quality of life for the intellectually disabled ward."[14] See 115 Code Mass. Regs. § 6.63(2)(c)(1) (2009) ("The written notice shall . . . include a statement of how the proposed move will result in improved services and supports and quality of life for the individual").[15] The purpose of the transfer notice is to allow the guardians to

---

[13]The only proposed ISP modification submitted after the meeting for approval by facility director Montminy was the change in residence. To the extent any impropriety was suggested, Ilse Peter, Montminy's designee, was permitted by DDS regulation to sign the ISP modification sheet approving the proposed transfer after the ITP/ISP modification meeting. See 115 Code Mass. Regs. § 6.25(7) (2009).

[14]The relevant portion of the letter giving notice to the guardians stated: "Members of [M.D.'s] ISP team have selected the specific site at the Wrentham Developmental Center for [M.D.] and are confident that the staffing, services, and amenities available at Wrentham will meet all of [M.D.'s] ISP needs. Wrentham Developmental Center has a state-of-the-art acute care medical facility, workshops, a heated indoor Olympic size pool, a full size gymnasium, modern exercise equipment, and a full range of clinical services in the areas of medicine, nursing, psychology, recreation, social services, occupational and physical therapy, communication, adult education, vocational services, orientation and mobility services, and adaptive physical education. Although the Fernald Center is closing and will no longer be available as a residential option, Wrentham Developmental Center is a Title XIX certified facility offering continuity of services and supports for [M.D.] and the proposed move to Wrentham will result in improved services, supports and quality of life for her."

[15]The guardians have waived their challenges to other alleged deficiencies in the notice. See 115 Code Mass. Regs. § 6.63(2)(c)(2), (4).

make an informed decision about a proposed transfer within the forty-five-day statutory period. Although presumably not every improvement must be cited in the transfer notice, sufficient details tailored to the ward's individual circumstances must be included. If the rule were otherwise, the guardians would be unable to give timely informed consent to the transfer or, in the alternative, to draft a meaningful written objection as required by the statute.

Here, DDS made no attempt within the four corners of the notice to list or to describe the ways in which M.D.'s services and quality of life would *improve* at WDC. DDS enclosed a number of attachments with the letter, including M.D.'s most recent June 16, 2009, ISP (including revisions from a September 22, 2009, meeting) and the May 19, 2010, ITP. However, while these documents provided a wealth of information about M.D. and her current needs and supports, none provided any factual basis from which a finding of improvement could be made.

Even though the notice was defective, in the context of a G. L. c. 30A appeal, the guardians were still required to show that their substantial rights may have been prejudiced.[16] See *Molly A.* v. *Commissioner of the Dept. of Mental Retardation*, 69 Mass. App. Ct. 267, 287 n.28 (2007) (applying a harmless error analysis to a regulatory violation).

Here, in fulfilling their statutory duty, the guardians submitted a timely letter of objection stating their reasons for opposing *any* move out of FDC.[17] To quote the guardians' opening objection to the transfer: "We believe that 'equal or better care' cannot and will not be received at Wrentham or at any other

[16]The guardians' argument that no showing of prejudice is required was not persuasive. None of the cases they cite was pursued through a c. 30A appeal. The vast majority of cases require a showing of prejudice for a reversal. See, e.g., *American Farm Lines* v. *Black Ball Freight Serv.*, 397 U.S. 532, 538-539 (1970); *Martorano* v. *Department of Pub. Utils.*, 401 Mass. 257, 262-263 (1987).

[17]Even at this early stage of the proceedings, the guardians were represented by legal counsel (a predecessor to counsel on appeal). Neither party pointed out that, contrary to the magistrate's ruling, the guardians did in fact challenge the adequacy of the notice in their objection letter. Notwithstanding the objection, it was undisputed that the guardians made no request for additional time or information to weigh the merits of the proposed move to WDC. They also did not visit WDC until after the May 19, 2010, ITP/ISP modification meeting.

location. [M.D.] has lived at Fernald for 34 years and it is in her best interest to remain at Fernald."[18] Following the denial of their motion to dismiss based, in part, on the inadequacy of the transfer notice, the guardians were given the opportunity to reargue the procedural issue at the hearing.[19]

There was no evidence that as a result of the inadequate notice, the guardians' ability to prepare their case was compromised. As a practical matter, the ITP attached to the notice identified as important contact persons available for consultation, among others, Jim Antonopoulos, the psychologist well-liked by all, who wrote M.D.'s behavioral plan and took her out to weekly dinner outings; and Wendy Smith, M.D.'s Q. Both transferred over to WDC around this time (a fact obviously known to the guardians). As even the guardians acknowledged in their brief, DDS provided verbal responses to the guardians' questions during the forty-five-day statutory period.

We agree with the guardians that DDS should not be allowed to shift its statutory duty to gather information regarding the alleged improvements to them.[20] Here, DDS cured any possible defect in writing before the DALA hearing. In its answers to M.D.'s interrogatories, DDS provided the guardians with a full explanation regarding how the transfer to WDC will result in improved services and quality of life for M.D. These subjects were explored in detail at the hearing. The guardians' claim that meaningful information regarding the benefits to M.D. at WDC was first revealed *"during the hearing"* (their emphasis) was mistaken. At most, the guardians have shown a delay in DDS's

---

[18]One of M.D.'s guardians, Regina Davidson, reiterated this sentiment at the end of the ITP/ISP modification meeting, stating she wanted M.D. to remain at FDC.

[19]As the guardians pointed out, the failure to object during the forty-five-day statutory period is deemed consent to the proposed transfer. See 115 Code Mass. Regs. § 6.63(3)(b). In a case involving a defective DDS notice, a guardian presumably could avoid giving implied consent by raising a timely objection to the notice within the statutory period (as the guardians did here).

[20]The guardians used the word "burden" to refer to DDS's statutory *duty* to provide in its request for consent a statement of improvements in services and quality of life at WDC. See G. L. c. 123B, § 3, par. 2. There is no question that the magistrate correctly placed upon DDS the burden of proving the improvements. See G. L. c. 123B, § 3, par. 3.

fulfilment of its statutory duty. We do not think that the delay rises to the level of reversible error.[21]

*Substantial evidence to support the magistrate's decision.* The guardians claim that the magistrate's decision was not supported by substantial evidence. Our review of the evidence is limited; DALA, not the court, resolves issues of conflicting evidence. See, e.g., *Duggan* v. *Board of Registration in Nursing,* 456 Mass. 666, 673-674 (2010), and cases cited; *Maguire* v. *Director of the Office of Medicaid,* 82 Mass. App. Ct. 549, 553 (2012).

Here, the magistrate gave careful consideration to the objections raised by the guardians and to the evidence presented by DDS. From the guardians' perspective, the primary advantages of FDC are that it has been M.D.'s residence since 1985 and that it is closer to where the guardians reside. Additionally, M.D. enjoys the interactions that are possible at the FDC swimming pool[22] and her involvement with Sunday worship services. The magistrate considered these arguments presented by the guardians as well as the guardians' contention that M.D.'s room at FDC is larger and more homelike than the room where she is scheduled to reside at WDC.

The magistrate also carefully considered the clear advantages of WDC, which included superior medical and clinical services; increased work, social, and recreational opportunities; and the presence of many staff and residents who have already made

---

[21]Even assuming that DDS's July 28, 2010, statutory request to DALA for an adjudicatory proceeding (attaching DDS's inadequate transfer notice) failed to satisfy the specificity requirements of the Formal Rules of the Standard Adjudicatory Rules of Practice and Procedure, any defect, for the reasons set forth previously, was harmless. See 801 Code Mass. Regs. § 1.01(6)(c) (1998) (governing the form and content of claims; requiring the notice of claim to "state clearly and concisely the facts upon which the Party is relying as grounds . . .").

[22]Although the magistrate found that M.D. would miss her interactions with members of the local community at the FDC pool, a practice not allowed at WDC, he concluded that M.D. would have numerous opportunities for different types of community integration available at WDC such as on-site dog shows and county fairs. Substantial evidence supported the magistrate's findings, among others, on the subject of isolation, that WDC would provide wider and more frequent opportunities for recreational and social activities, and more opportunities for residents to take day and overnight off-site trips into the community.

the transition to WDC and with whom M.D. is familiar. The magistrate noted:

> "A point-by-point comparison of the two facilities may reveal some features favoring one facility, while the remaining features favor the other facility. But the statute does not require that every feature of a proposed facility be superior in order to approve a transfer. Rather, by focusing on the best interest of the ward, it commands that the whole picture be examined."

The magistrate carefully considered the evidence presented. There was substantial evidence to support his determination.

*Remaining issues.* We next turn to the issue of the informal meetings that predated the ITP/ISP modification meeting. First, the guardians contend that the *decision* to transfer M.D. to WDC was made *before* the May 19, 2010, ITP/ISP modification meeting, without the involvement of the guardians or any consideration of M.D.'s needs. The record does not support their contention.

The evidence relating to this issue was as follows. After announcing in December, 2008, that FDC was expected to close at the end of fiscal year 2010, DDS gave the guardians several placement options (*all* available ones in fact): WDC; Hogan Regional Center (Hogan) (the only other ICF to remain open); a State-run or vendor-operated community-based setting (i.e., group homes); and (addressing the guardians' geographic concerns) Malone Park, M.D.'s residence at FDC, which was to be converted into a State-run group home after Fernald's closure as an ICF.[23] The guardians may not have liked the choices, but they were offered.

The paper trail shows involvement by the guardians, who rejected every possible placement suggested by the ITP team and Diane Enochs. By letter dated February 8, 2009, the guardians, who live in Arlington, rejected WDC and Hogan as op-

---

[23]On January 23, 2009, DDS specifically offered to place M.D. with a group of her peers at WDC. Most guardians of M.D.'s housemates liked the idea of keeping the group together and consented to the transfer to what turned out to be Heffron Halls. Due to the lack of guardian interest, the plan to keep Malone Park open as a group home was abandoned.

tions (too far away), indicating their wish for M.D. to remain at FDC and asserting those other two facilities were not equal or better. One of the guardians, Regina Davidson, categorically rejected all group homes due to what she perceived as an inferior service delivery model and the lack of supervision.[24] In a letter to Davidson dated October 8, 2009, discussing the Malone Park option, Enochs cautioned her that if DDS did not hear back from the guardians by October 26, 2009, DDS would continue to follow the placement recommendations of the ISP team. By letter dated November 9, 2009, Enochs acknowledged Davidson's rejection of the Malone Park option and informed her that the ISP and ITP teams would begin work on a transition plan to place M.D. at WDC. Enochs welcomed the guardians' participation in the planning process and indicated that other placement opportunities were available at Hogan if they preferred. By letter dated March 2, 2010, Enochs notified the other guardian, Albert Davidson, that the ISP team had recommended the placement of M.D. at WDC.

As noted above, see note 12, *supra,* Gale Conley testified that she worked with the clinical members of the ISP team to gather feedback on M.D.'s placement needs and on potential placements. To the extent that the guardians complain about this informal process, ultimately they were protected by the formal procedural rules governing ISP modifications, which require the holding of an ITP/ISP modification meeting once a specific placement is recommended.[25] See 115 Code Mass. Regs. § 6.25(4) (2009). Only after the ITP/ISP modification meeting did Conley finalize the ITP, which is always subject to change based upon the input of the guardians and others.

The team placement *recommendation* seems to have come about through a series of informal consultations. The guardians

[24]In contrast to the group home model, all clinics, services, and day programs at an ICF are provided on-site twenty-four hours per day, seven days of the week (24/7). The testimony, however, established that the group home model is changing; not only are the homes becoming specialized, they now offer some clinical services on-site 24/7.

[25]In addition to the ITP/ISP modification meeting, M.D.'s ISP team met separately for her annual ISP meeting on or about June 15, 2010. At that meeting, the ISP team would have discussed the many elements of an ISP and developed a new ISP to cover the following year.

argue that members of the ISP team, including the guardians, must be specifically invited to "any and all meetings" at which any proposed modification may be considered. Given the substantial number of administrators, direct care workers, and clinicians who give input into a transfer recommendation, it would appear to be far too cumbersome to require DDS to involve the guardians in all these communications. Again, the guardians here had the opportunity at the subsequent formal ITP/ISP modification meeting (at which they were represented by counsel) to discuss and to question any aspect of the recommended placement decision and the transitional plan.[26]

At oral argument, M.D.'s counsel argued that the magistrate at the DALA hearing was required by G. L. c. 123B, § 3, to consider multiple alternative placements (and not just the one chosen by DDS).[27] This argument was not raised at DALA or in the Superior Court (nor was it briefed on appeal). Given the limited nature of the c. 30A appeal, we decline to reach this issue.[28]

However, assuming, without deciding the issue, it would appear that the notice section in par. 2 of G. L. c. 123B, § 3, should be read in conjunction with par. 3. That statutory language seems to set up a one-to-one comparison situation.[29] As the magistrate specifically found, DDS did in fact consider alterna-

---

[26]Seventeen individuals attended M.D.'s ITP/ISP modification meeting, including Conley, Smith, and Antonopoulos, and were available for questioning.

[27]The statute provides, in relevant part, "[DALA] shall be authorized to conduct said proceeding to determine whether the transfer should proceed. . . . The hearing officer shall determine *which placement* meets the best interest of the ward giving due consideration to the objections to the placement made by the relative or permanent guardian" (emphasis added).

[28]In this second-level appeal, for the first time, the guardians seek to impose a different burden of proof upon DDS, contending that DDS violated its own regulations and the disengagement order by failing to provide M.D. with "the least restrictive, most typical, appropriate residential environment, together with the most appropriate treatment, training and support services suited to that person's individual needs." 115 Code Mass. Regs. § 6.05(2)(e) (listing M.D.'s special eligibility entitlements as a *Ricci* class member). See *Ricci III, supra* at 987 n.2. Although M.D. possesses these rights, this argument was not presented at DALA or in the Superior Court and is deemed waived. See *Albert* v. *Municipal Ct. of Boston,* 388 Mass. 491, 493-494 (1983); *Foxboro Harness, Inc.* v. *State Racing Commn.,* 42 Mass. App. Ct. 82, 85 (1997).

[29]Paragraph two of G. L. c. 123B, § 3, provides, in relevant part, "The request for consent shall include (1) a statement of how the proposed residential

tive placements during the planning stage. In considering the transfer process as a whole, that would seem to be the most appropriate time to do so.[30]

For the reasons stated above, the judgment of the Superior Court affirming the transfer decision in M.D.'s case is affirmed.

*So ordered.*

transfer from the current facility *to the proposed residential facility* will result in improved services and quality of life for the intellectually disabled ward, (2) the location *of the proposed facility* and a statement that said guardian may examine the facility . . ." (emphasis added).

[30]If DDS were required to present multiple alternative placements at the ITP/ISP modification meetings (and to bring in the necessary clinicians), that requirement would place an enormous burden upon DDS and would be highly inefficient. See, e.g., the testimony of Gale Conley regarding the scope of her premeeting work and interaction with *one* potential receiving facility. The guardians' assertion in their postargument submission that WDC representatives were *first* involved in the transfer process at the ITP/ISP modification meetings did not comport with the evidence.