G.R.[1] *vs.* DEPARTMENT OF DEVELOPMENTAL SERVICES
& another.[2]

No. 12-P-951.

Middlesex. June 11, 2013. - February 18, 2014.

Present: BERRY, KATZMANN, & RUBIN, JJ.

*Department of Developmental Services. Intellectually Disabled Person.*
*Administrative Law,* Hearing, Findings, Substantial evidence. *Notice.*

Discussion of the substantial evidence standard of review applicable to a deci-
sion of an administrative magistrate. [794]
Substantial evidence supported the ultimate conclusion of an administrative
magistrate in the Division of Administrative Law Appeals approving the
transfer by the defendant Department of Developmental Services (depart-
ment) of the plaintiff from one intermediate care facility for intellectually
disabled persons to another such facility, i.e., that the transfer would result
in improved services and quality of life for the plaintiff, and would be in
his best interest [797-803]; further, this court concluded that even if the
magistrate exceeded her authority under G. L. c. 123B, § 3, in modifying
the department's individual transition plan for the plaintiff, any error was
harmless [804-805].
No prejudice to the plaintiff's guardian arose from the inadequate notice of
the transfer by the defendant Department of Developmental Services of the
plaintiff from one intermediate care facility for intellectually disabled
persons to another such facility. [805-806]
At a hearing on the transfer by the defendant Department of Developmental
Services of the plaintiff from one intermediate care facility for intellectu-
ally disabled persons to another such facility, an administrative magistrate
in the Division of Administrative Law Appeals did not err in declining to
consider the Federal law claims of the plaintiff's guardian; further, even
assuming that the issue of compliance or legality should have been
considered, the guardian failed to support his conclusory claim of a regula-
tory violation with any factual analysis or citation to relevant authority.
[806]
This court declined to consider an argument that it deemed waived. [806]
There was no merit to a claim by the plaintiff's guardian concerning the
failure of the defendant Department of Developmental Services, in propos-
ing the transfer of the plaintiff from one intermediate care facility for intel-

[1]By his guardian, Daniel Staples.
[2]Division of Administrative Law Appeals.

lectually disabled persons to another such facility, to comply with a certification requirement arising under litigation in a Federal District Court. [806-807]

CIVIL ACTION commenced in the Superior Court Department on April 28, 2011.

The case was heard by *Dennis J. Curran*, J., on a motion for judgment on the pleadings.

*Stephen M. Sheehy* for the plaintiff.

*Timothy J. Casey*, Assistant Attorney General, for the defendants.

KATZMANN, J. Through his guardian, G.R., a severely intellectually disabled individual who resides at the Fernald Developmental Center (FDC), challenges a Superior Court judge's affirmance of the decision of the Division of Administrative Law Appeals (DALA) approving his transfer to the Wrentham Developmental Center (WDC). See G. L. c. 123B, § 3.[3] We focus our analysis on whether the Department of Developmental Services (DDS) presented the administrative magistrate at the DALA hearing with substantial evidence to support her decision that the interfacility transfer would be in G.R.'s best interest. After reviewing the administrative record and the parties' submissions, we conclude that the magistrate's decision was supported by substantial evidence and that there is no ground to set aside the DALA's decision. We affirm the judgment of the Superior Court approving the DALA's decision. See G. L. c. 30A, § 14(7).

1. *Background.* At the time of the administrative hearing, G.R. was sixty-six years old. He has lived at FDC since 1956. G.R. is severely intellectually disabled as well as blind and deaf. He cannot communicate verbally, although he will vocalize sometimes.

In 2003, the year that its closure was announced, FDC served 280 residents. In November, 2010, FDC only served twenty-three residents. There are over eighty buildings on the FDC

---

[3]Pursuant to executive and legislative mandate, the Fernald Developmental Center (FDC) will be closing as an Intermediate Care Facility (ICF) for Persons with Mental Retardation. See *M.D.* v. *Department of Developmental Servs.*, 83 Mass. App. Ct. 463, 464 & n.4 (2013) (*M.D.*).

campus, and approximately fifty are not in use. As an older facility, FDC has extensive physical plant maintenance issues; however, funds are only available for necessary repairs, rather than renovations. There have also been significant staffing changes associated with FDC's closure. From 2004 to the time of the administrative hearing, there were fifteen consolidations in residences or day programs. Staff members have transferred to other facilities, have retired, or have been laid off.

As a *Ricci* class member, see *Ricci* v. *Okin*, 823 F. Supp. 984 (D. Mass. 1993) (*Ricci III*), with special eligibility for services, G.R. is entitled to a lifetime of supports from DDS without regard to "the availability of resources." 115 Code Mass. Regs. § 6.07(1)(a) (2009). His guardian, however, cannot dictate where those supports are provided. See *Ricci* v. *Patrick*, 544 F.3d 8, 19 (1st Cir. 2008), cert. denied, 556 U.S. 1166 (2009) (*Ricci V*).[4]

The Legislature has made clear that the decision to close FDC does not reduce its commitment to the individual residents of FDC, including *Ricci* class members like G.R. See, e.g., St. 2011, c. 68, § 2, item 5930-1000 ("any client transferred to another ICF [Intermediate Care Facility]/MR as the result of a facility closure shall receive a level of care that is equal to or better than the care that had been received at the closed ICF/MR"); *M.D.* v. *Department of Developmental Servs.*, 83 Mass. App. Ct. 463, 467 n.8 (2013) (*M.D.*). Thus, before it may close FDC, DDS must find placements to which to transfer each resident that will provide him or her with improvements in his or her services and quality of life and be in his or her best interest. See G. L. c. 123B, § 3.

DDS has proposed to transfer G.R. from his current residence at FDC to Heffron Hall apartment 4B at WDC. On May 28, 2010, DDS, as required by 115 Code Mass. Regs. § 6.63 (2009), and G. L. c. 123B, § 3, issued a forty-five day notice and request for proposed facility transfer to G.R.'s guardian. The guardian

---

[4]In 2008, the Court of Appeals for the First Circuit in *Ricci V* observed that "the federal district court . . . conscientiously and with great care presided over institutional reform litigation concerning these mentally retarded persons since 1972." *Ricci V, supra* at 11. See generally Belin, Benchmarks XXIV The Life and Legacy of Joseph L. Tauro 67-81, 185-190 (Mass. Cont. Legal Educ. 2011).

objected to the transfer, and DDS then referred the case to DALA. A DALA magistrate conducted a hearing over three days in the fall of 2010. On April 14, 2011, the DALA magistrate concluded that DDS's proposed transfer of G.R. to WDC was in his best interest. On March 28, 2012, a Superior Court judge affirmed the DALA magistrate's decision. The guardian then filed a timely notice of appeal to this court.

2. *Standard of review.* This is an appeal under G. L. c. 30A, § 14. By statute, therefore, we must review the conclusion of the administrative magistrate to determine whether it is supported by "substantial evidence." G. L. c. 30A, § 14(7)(*e*). "[T]o determine whether an agency's decision is supported by substantial evidence, we examine the entirety of the administrative record and take into account whatever in the record fairly detracts from the supporting evidence's weight." *Cobble* v. *Commissioner of the Dept. of Social Servs.*, 430 Mass. 385, 390 (1999). We defer to the administrative magistrate's subsidiary factual findings unless they are unsupported by substantial evidence. See, e.g., *Kippenberger* v. *Board of Registration in Veterinary Med.*, 448 Mass. 1035, 1036 (2007). Moreover, " 'it is for the agency, not the reviewing court, to weigh credibility of witnesses and resolve factual disputes involving contradictory testimony.' In addition, the reviewing court must defer to the agency's right to draw inferences from the testimony and evidence before it." *Duggan* v. *Board of Registration in Nursing*, 456 Mass. 666, 674 (2010), quoting from *Cobble* v. *Commissioner of the Dept. of Social Servs.*, *supra* at 393 n.8.

Ultimately, "substantial evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.' " *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981), quoting from G. L. c. 30A, § 1. Where an administrative decision is supported by substantial evidence, we "may not replace the [administrative magistrate's] choice between two conflicting views even though we might justifiably have made a different choice had the matter been before us in the first instance." *Hanover Ins. Co.* v. *Commissioner of Ins.*, 443 Mass. 47, 50 (2004).

3. *Findings of fact.* During the three-day administrative hear-

ing, the magistrate heard from a long list of witnesses[5] and then arrived at the following findings of fact. G.R. is severely intellectually disabled. He is also blind and deaf. He cannot communicate verbally, although he will vocalize sometimes. When he is frustrated, upset, or angry, G.R. will lightly touch his torso or the side of his head as a warning. If the warning is not heeded, G.R. will hit himself harder or become aggressive toward others. G.R. has a seizure disorder, which is controlled by medication, the levels of which are measured regularly and adjusted when necessary. G.R. also has a number of additional medical conditions.

G.R. currently lives in cottage 8 at FDC. G.R. moved to cottage 8 from Farrell Hall at FDC as part of an internal consolidation. The transition went smoothly. In advance of the move, G.R. and an orientation and mobility specialist visited cottage 8 to explore the perimeter of the space. The orientation and mobility specialist helped G.R. identify landmarks to orient him to the new space. Direct care staff who were familiar to G.R. were also present during the successful transition process.

Cottage 8 is a horseshoe-shaped structure with two sides which can each accommodate eight people. A shared kitchen, pantry, dining area, and office space are located in the middle of the cottage. Each side contains four bedrooms, three and one-half bathrooms, a living room, and a sunroom. G.R. lives with three other men, two of whom are blind. G.R. requires a single bedroom because he has a history of rummaging through others' belongings.

G.R. does not interact with his peers. He may recognize others

---

[5]DDS presented testimony from the following individuals: Linda Montminy, facility director at FDC; Mark Lewis, Qualified Mental Retardation Professional ("Q"), or service coordinator, at FDC; Nancy Perrotti, registered nurse (R.N.), clinical director and placement nurse at FDC; Stephen Jordan, orientation and mobility specialist employed by the Massachusetts Association for the Blind who works at FDC; Nicholas D'Aluisio, facility director at WDC; Gale Conley, unit director for Heffron Hall A and B at WDC; Kathleen Kenney, orientation and mobility specialist at WDC; and Maureen Ethier, R.N., a nursing supervisor at WDC.

On behalf of G.R., his guardian testified, as did Elizabeth K. Schodek, a licensed clinical social worker and formerly a social worker at FDC, and Regina D., one of the guardians for M.D., another FDC resident (See *M.D.*, *supra* at 463 n.1).

by smell or by the manner in which they touch him. G.R. spends most of his free time in the sunroom where his couch and favorite possessions are located. He also enjoys certain table top activities. Finally, G.R. enjoys taking a warm bath each day.

G.R. attends a daily sheltered workshop at site 7 at FDC, to which he travels by van. G.R. has excellent fine motor skills, and he is able to perform a variety of tasks, including a five-piece pen assembly job. He is paid for his work and earns between three and eight dollars per week. G.R. eats lunch at his work site and travels to the dining room with direct care staff providing sighted guidance.

DDS proposes to move G.R. to Heffron Hall apartment 4B at WDC. On November 4, 2010 (one of the dates of the DALA hearing), there were 324 residents at WDC. Approximately fifty residents transferred from FDC to WDC the year before G.R.'s DALA hearing. Additionally, WDC employs roughly 1,000 individuals, and approximately sixty-two of the staff members at Heffron Hall A and B transferred from FDC.

WDC provides clinical services in psychology, recreation, social services, nursing, orientation and mobility, vocational work, and physical, occupational, and speech therapies. Each clinical unit has its own director. Clinical staff must spend at least fifty percent of their time providing direct care to residents. Gale Conley is the unit director for Heffron Hall A and B. Conley, who worked at FDC from 1982 until 2010, has known G.R. for roughly twenty years. As the assistant director of clinical services at FDC, Conley supervised staff and oversaw the delivery of clinical services as set forth in each resident's individual service plan (ISP).[6] Accordingly, she was familiar with G.R.'s

---

[6]An ISP (an individual support plan or an individual service plan) is an annually reviewed document based on assessments by professionals who work with a resident and on input from his or her family and guardians that describes his or her current clinical situation, objectives in areas such as health, cognitive development, independent living skills, and social development, and supports to be utilized to assist the individual in obtaining those goals. See *M.D.*, *supra* at 465 n.5. The guardians have the right to appeal any issue they have with the language or content of the ISP. See 115 Code Mass. Regs. § 6.32 (2009). Importantly, after a resident moves into a new facility, there is an assessment process for the first thirty days. Afterwards, the facility staff meet to determine whether any modifications to the ISP are necessary or beneficial.

needs as set forth in his ISP. At WDC, Conley would see G.R. each day on her rounds for the day programs and worksites.

Heffron Hall B is a two-story building with four apartments. It can accommodate thirty-two residents, with up to eight residents in each apartment. A nurses' station is located on each floor in the hallways between the two apartments. At Heffron Hall, WDC provides twenty-four hour nursing to its residents. Heffron Hall B contains space for day programs and leisure activities in the basement.

DDS proposes to move G.R. to Heffron Hall apartment 4B because he could live with people whom he already knows, as three residents who now live in apartment 4B previously lived with G.R. in cottage 8. DDS also proposes to transfer to apartment 4B three men who currently live in cottage 8 with G.R.

Apartment 4B has the following layout. It contains a common area or living room near the nurses' station. There is a dining area and lounge located across from the living room. There are two bathrooms in the apartment. A freestanding tub was installed in one of the bathrooms in apartment 4B. The tub has side-entry access and powered raising, lowering, and reclining capabilities. The bedrooms are clustered near the end of the hallway. In all, the living room, dining area, lounge, and bedroom are smaller than the comparable living areas in cottage 8.

4. *Evidence supporting decision.* The primary issue presented by this appeal is whether DDS provided the magistrate with substantial evidence to determine that transferring G.R. from FDC to WDC is in his best interest. In undertaking this analysis, the magistrate properly compared the proposed services at WDC to the existing services at FDC at the time of the hearing:

> "Chapter 123B, § 3[,] contemplates an analysis of ongoing services offered by one facility as compared to the ongoing services of another facility. In stark contrast, here we are faced with a closing facility with diminished supports and services and a proposed placement at a facility where improvements and renovations have been made to accommodate [FDC] residents. Under c. 123B, § 3, nonetheless, the two facilities must be compared. The

most reasonable comparison is the circumstances at the facilities as they existed at the time of the hearing."[7]

The magistrate thoughtfully presided over three days of testimony and issued a careful, detailed thirty-five page decision. The magistrate properly compared the offerings of the two ICFs as they pertained to G.R.'s circumstances, rejected some touted improvements as irrelevant, and did not find the guardian's objections determinative. Although the magistrate was not impressed with the small improvements in several service areas available at WDC, indicating that they were inadequate to satisfy DDS's burden of proof in the proceeding, she found that the improvement in orientation and mobility services at WDC tipped the balance in favor of the transfer. We find that substantial evidence supported the magistrate's ultimate conclusion that the transfer will result in improved services and quality of life for G.R. and will be in his best interest. See G. L. c. 123B, § 3. That conclusion is consistent with the imperative, implicit in the statutory scheme, that G.R.'s human dignity be respected and protected.[8]

The magistrate aptly noted that WDS and FDC share many characteristics: (1) both facilities are certified under Title XIX of the Social Security Act, codified at 42 U.S.C. § 1396-1

---

[7]In her concluding sentence, the magistrate stated: "In view of the services and opportunities discussed above and the anticipated closure of [FDC], and after considering the guardian's objections to the proposed placement, I conclude that the proposed transfer of [G.]R. to [WDC] is in his best interest." DDS acknowledges correctly that the magistrate may not rely upon the inevitable closing of FDC as a basis for her decision. Earlier in that decision, however, the magistrate outlined the proper method of comparison, that is, the comparison between the proposed services at WDC and services at FDC at the time of the hearing. The concluding sentence, though a misstatement, did not in fact reflect the magistrate's calculus of decision. In light of her earlier, detailed discussion of the appropriate method of comparison and her application of that standard, the magistrate properly compared the proposed services at WDC to the services offered at FDC at the time of the hearing without consideration of FDC's impending closing. As such, ultimately there was no legal error.

[8]As detailed below, the magistrate found that DDS selected WDC for G.R. because the services provided would improve his quality of life. Within WDC, DDS selected Heffron Hall apartment 4B because G.R. would be reunited with former roommates. The magistrate chose to credit DDS's rationale. On appeal, the magistrate's decision is entitled to deference in making this decision.

(Supp. IV 2010); (2) both facilities have the capability to implement G.R.'s ISP; and (3) both are staffed by dedicated individuals who are caring and more than capable of providing services needed by G.R. and other residents.

In her analysis, the magistrate found that, contrary to DDS's arguments, G.R. would not benefit from WDC's provision of twenty-four hour nursing or an increased array of leisure and recreational activities. Additionally, the magistrate found that G.R. would not benefit from the change in direct care staff.

On the other hand, the magistrate found that G.R. would benefit from the following minor improvements. First, all clinical staff at WDC are required to spend fifty percent of their time providing direct services to residents. Second, there would be familiar clinical staff at WDC. Third, G.R. would receive a minor improvement in the provision of medical services because his primary care physician at WDC is also a neurologist, and his seizure disorder medications would be monitored more closely. Fourth, G.R. would have a habilitation coordinator as opposed to a direct care worker (who is trained by the habilitation coordinator) helping to implement his hygiene ISP objective. Fifth, G.R. would benefit from an improved outdoor walking path at WDC.

However, in the end, the magistrate ultimately based her decision on the following rationale:

> "[A] comparison of the two facilities leads me to conclude that DDS has shown that the proposed transfer to [WDC] will offer [G.]R. improved services and quality of life. My conclusion rests principally on the improved orientation and mobility services offered to [G.]R. The small improvements in other areas would be insufficient to meet DDS's burden here."

Accordingly, we focus our analysis on whether DDS presented substantial evidence to support the magistrate's determination that in moving to WDC, G.R. would benefit from improved orientation and mobility services.

During the administrative hearing, both Stephen Jordan — the orientation and mobility specialist at FDC — and Kathleen Kenney — the orientation and mobility specialist at WDC —

provided testimony. Both Jordan and Kenney opined that G.R. will receive improved orientation and mobility services at WDC. At FDC, G.R. currently receives training once a week; however, if he were to move to WDC, he would benefit from receiving training at least three times per week. Kenney would provide direct service for G.R. at least twice each week, and an orientation mobility assistant would provide direct service at least once each week. Kenney would also have opportunities to observe G.R. and direct care or clinical staff who work with him when she is providing direct care for other vision-impaired individuals in the apartment or at the day program.

Additionally, G.R. would be able to receive services through the service specialist program at WDC. This program allows residents to receive one-on-one staffing in addition to that provided by regular direct care and clinical personnel. In this case, Kenney would train the service specialist to use sighted guide or trailing techniques with G.R.

Given these additions in orientation and mobility services, the magistrate arrived at the following conclusion:

> "The additional orientation and mobility services that [G.]R. will receive at [WDC] will likely assist him in regaining skills he lost following his hip surgery. If he were able to improve his trailing techniques, so that he could trail independently, Kenney could reintroduce a cane to [G.]R. In Jordan's view, [G.]R. is capable of learning to use a cane again. I give greater weight to Jordan's opinion because he knows [G.]R. better than Kenney and [G.]R. does not know her at all. Use of a cane would give [G.]R. greater independence, which would offset any reduced independence that may result from the more crowded conditions at Heffron Hall B and the fact that his bedroom and bathroom are not near the den where he would likely spend much of his time.

> "[G.]R. has shown in his prior moves that he is able to learn new routes and orient to new spaces with appropriate transition measures. While he has not been able to trail independently to the dining hall at Cottage 8, his ability may have been affected by his surgery. The additional time during which he would receive direct orientation and

mobility services would likely offset, at least in part, the challenges posed by a new setting.

"[G.]R. could also take advantage of the service specialist program to obtain additional one-on-one orientation and mobility services. Use of this program would provide increased repetition of trailing and sighted guide skills, thereby increasing the likelihood that [G.]R. will regain skills in using a cane and become independent. This program is not available at [FDC]."

We do not disturb the magistrate's finding that G.R. would greatly benefit from increased mobility and orientation training, as it was clearly based on substantial evidence presented by DDS. The magistrate reasonably relied upon expert testimony to arrive at her conclusion. The magistrate recognized that as in any move, G.R. may initially lose some of his independence. However, the magistrate found that as a result of the increased orientation and mobility services offered at WDC, G.R. could strengthen his trailing skills, hopefully resume use of his cane, and ultimately, through the additional services, attain a degree of independence that would improve his quality of life.[9] See 115 Code Mass. Regs. § 2.01 (2009) (DDS lists "enhanced independence" as one of its enumerated goals in providing supports).

We address two concerns raised by G.R.'s guardian on appeal that challenge the magistrate's determination that G.R. would enjoy improved orientation and mobility training as a result of his move to WDC. While the magistrate did not explicitly consider these two concerns in her opinion, she heard testimony on these subjects during the three-day hearing and, nevertheless, still chose to approve the transfer. Accordingly, the magistrate did not have to credit the guardian's concerns; however, we take this opportunity to consider both arguments in greater

---

[9]There is record evidence to support the magistrate's conclusion that G.R. will have greater independence at WDC. For instance, Kathleen Kenney testified that "[G.R.] likes to explore. A cane is a good way for him to be able to explore a little more independently because he wouldn't be so reliant on physical touch to a staff or to a wall or trailing surface. The cane, if used appropriately, would be out in front of him, so it would alert to any obstacle that would be in his path. So it adds some of — kind of a layer of protection as well as just a little more freedom."

depth and to consider whether DDS presented substantial evidence to allay the guardian's concern.

First, the guardian expresses concern about the large column that is located in the middle of the living room in his Heffron Hall apartment. The guardian claims that it will be an unnecessary and dangerous obstacle. However, during her testimony, Kenney addressed the presence of the column and noted that it could actually serve as a beneficial landmark to G.R.:

> "He would need to learn that it's there, and I believe he could do that just because he's oriented to other spaces. And it's actually — from my perspective, it's better that it's a big column. It's a wide column, and that's better than having like a smaller pole because he's going [to] find the big column. . . . So the bigger column acts as a landmark. So once [G.R.] learns this space and he makes contact with that column, he's going to say: 'Oh, there's the column, so I know to go this way or this way or this way.' You know, he can go in any direction from that column because he's there. It's a landmark that's never going to move, and landmarks are helpful for people to use as orientation."

While G.R.'s guardian provided testimony that he did not believe that the column would serve a useful purpose, the magistrate did not credit this testimony. We defer to the magistrate's decision to rely on the testimony of Kenney in making this determination; it is for the magistrate to resolve factual disputes. See, e.g., *Duggan* v. *Board of Registration in Nursing*, 456 Mass. at 674.

Additionally, the guardian contends that it would not be in G.R.'s best interest to transfer to Heffron Hall because, unlike in cottage 8, in the living area in Heffron Hall, the furniture is against the wall and, thus, there are no trailing bars against the walls. As a result, according to the guardian, G.R. would not be able to navigate independently through the living room.

The guardian is correct that at Heffron Hall there is furniture against the walls of the living room and there are trailing bars only along the hallways where the bathrooms and bedrooms are located. When G.R. was at Farrell Hall in FDC, prior to his move to cottage 8, all of the furniture was against the wall and

he had to trail around the furniture to arrive at his bedroom. According to Jordan, G.R., as he successfully did in Farrell Hall and cottage 8 at FDC, needs to familiarize himself to his new environment and then he will be able to successfully navigate through his living room. Jordan stated, "I think it's all depending on, you know, the training and . . . the reinforcement that he has. . . . I think it's just . . . him becoming familiar with however the . . . furniture is placed." Moreover, both Jordan and Kenney noted that G.R.'s trailing skills are transferable to a new environment and that G.R. does not need a bar in order to trail as G.R. can trail a wall. G.R. would first need to learn the route with sighted guide, and then he could begin to navigate independently.

Finally, Mark Lewis (G.R.'s Q, identified in note 5, *supra*) testified that it has "always been [G.R.]'s preference . . . to have his furniture against the wall." Thus, there was evidence in the record that the fact that the furniture in the living room was against the wall did not diminish the improvements provided by the transfer.

We note that in addition to arguing that the transfer would result in a purported loss of independence for G.R., the guardian also sets forth three additional claims of diminishments in G.R.'s quality of life that would result from the transfer: eating, toileting, and bathing. While we address the concern regarding bathing in the section on modifying the Individual Transition Plan (ITP), *infra*, we briefly note the lack of clinical evidence supporting the claim that the transfer would result in a decrease in G.R.'s quality of life with regard to eating and toileting. Although passing testimony of G.R.'s guardian and M.D.'s guardian, Regina D., see *M.D.*, *supra* at 463 n.1, suggests such diminishments, the magistrate, in an appropriate exercise of her discretion, chose not to rely upon this testimony and, on review, we do not disturb this determination. See *Duggan* v. *Board of Registration in Nursing*, 456 Mass. at 673-674.[10]

---

[10]Additionally, the guardian asserts that as a result of the transfer, G.R. will live in a smaller space than that to which he has grown accustomed at FDC. It is undisputed that apartment 4B in Heffron Hall is smaller than the living space in FDC. Any lingering space concerns can be addressed at the thirty-day hearing which will occur after the transfer. See note 6, *supra*.

5. *Modifications to the Individual Transition Plan.* We are not persuaded by G.R.'s guardian's argument that the magistrate exceeded her authority by modifying the ITP. The guardian specifically objected to the most recent proposed location of G.R.'s work site and to the adequacy of the transitional planning.[11] Under G. L. c. 123B, § 3, the magistrate was not only authorized but required to consider these objections.

The magistrate concluded that two aspects of the ITP were inadequate and not in G.R.'s best interest. First, she concluded that G.R.'s work site should be at the Quinn Activity Center rather than at the basement of Heffron Hall. Even though the Quinn Center is a short van ride from Heffron Hall B, the magistrate found this site to be particularly beneficial to G.R. because the van ride to the work site more closely tracked G.R.'s current travel routine to work at FDC. The magistrate reasoned that routine and familiarity are very important to G.R. and that this arrangement would best allow for G.R. to succeed at work. Second, relying on testimony from two of DDS's witnesses — orientation and mobility specialists — the magistrate concluded that the number of scheduled transitional visits was inadequate, and that as testified to by the specialists, more visits were needed.

Even if the magistrate lacked the authority under G. L. c. 123B, § 3, to modify the ITP, any error was harmless. In fact, DDS has agreed that these modifications can be included in the new ITP plan.

Along these lines, during oral argument before this court, both parties addressed an additional potential modification to the ITP. The record is clear that G.R. greatly enjoys taking a bath every day. At WDC, DDS has installed a new, freestanding spa tub. During the administrative hearing, G.R.'s guardian testified that he believes that G.R. would be frightened by the

---

[11]Technically, on the matter of the work-site location, the magistrate enforced the ITP as written. While the transfer appeal was pending at DALA, G.R.'s clinical team changed its recommendation regarding the location based upon the successful experiences of G.R.'s peers working in the lower level of Heffron Hall B. The guardian objected to the lower-level location, opining that the change would decrease the quality of G.R.'s life. The magistrate found that the maintenance of G.R.'s routine was more important than keeping G.R. with his apartment mates.

new bathtub and that the change would deprive G.R. of one of his greatest sources of comfort. Ultimately, the magistrate agreed and found that "[t]he spa setting would likely upset or frighten [G.R.] . . . The new tub would be a strange environment for [G.R.]." "[I]f he is unable to become accustomed to the tub, his quality of life will suffer, given the enjoyment this activity brings him." We agree.

At oral argument before this court, G.R.'s counsel stated that it would be in his client's best interest for DDS to install a traditional tub, rather than a modern, spa tub. DDS seemed to be amenable to this change. It appears that DDS would serve G.R.'s best interest by providing a traditional tub rather than a spa tub. The magistrate found that the transition process is flexible and that the ITP may be modified or reviewed during the transition process depending upon G.R.'s needs, the clinical team's recommendations, and the guardian's wishes. We strongly encourage the members of G.R.'s ITP team to consider the benefits of switching bath tubs and for DDS to act accordingly.

6. *Remaining issues.* The guardian presented four additional arguments on appeal. We previously addressed each of these arguments in *M.D.*, *supra*. As we determined in *M.D.*, none of the arguments provides grounds for relief. We briefly address each claim below.

a. We agree with the magistrate and the guardian that the forty-five day statutory notice of the transfer, a form letter that lacked any detail regarding improvements allegedly awaiting G.R. at WDC, was inadequate. See G. L. c. 123B, § 3; 115 Code Mass. Regs. § 6.63(2)(c)(1) (2009). The stack of papers enclosed with the notice did not close the gap. However, for the same reasons stated in *M.D.*, *supra* at 470-473, we conclude that the guardian, who expressed his belief in his written objection to the transfer request that equal or better care for G.R. was unavailable anywhere but at FDC, cannot show prejudice. During discovery, DDS provided the guardian with answers to interrogatories listing many specific improvements. The information accurately outlined the subjects to be covered at the administrative hearing. There was no evidence that the guardian's ability to prepare his case was compromised in any way. Finally,

we note that the guardian did not request a continuance of the hearing.

b. G.R.'s guardian argues that the DALA magistrate failed to consider Federal law. We decided this issue in *M.D.*, *supra*, where we concluded that "[t]he administrative magistrate of DALA, an independent adjudicatory agency, properly read G. L. c. 123B, § 3, narrowly to limit his authority to determine whether the proposed transfer should proceed as in the best interest of [the ward]. . . . If the Legislature had intended for DALA to consider the guardians' Federal law claims in the context of a transfer proceeding, it would have included appropriate language to this effect in the statute." *Id.* at 466. Thus, we agree with the magistrate that the alleged violation of 42 Code Fed. Regs. § 483.470(a)(2) (2013) (prohibiting the segregation of residents solely on the basis of their physical disabilities) was beyond the scope of a transfer proceeding.

Even assuming that the issue of compliance or legality should have been considered, the guardian failed to support his conclusory claim of a regulatory violation with any factual analysis or citation to relevant authority. We need not address it further. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975); *Cameron v. Carelli*, 39 Mass. App. Ct. 81, 86 (1995).

c. "In this second-level appeal, for the first time, the guardian[] seek[s] to impose a different burden of proof upon DDS, contending that DDS violated its own regulations and the disengagement order by failing to provide [G.R.] with 'the least restrictive, most typical, appropriate residential environment, together with the most appropriate treatment, training and support services suited to that person's individual needs.' 115 Code Mass. Regs. § 6.05(2)(e) (listing [G.R.]'s special eligibility entitlements as a *Ricci* class member). See *Ricci III*, *supra* at 987 n.2. Although [G.R.] possesses these rights, this argument was not presented at DALA or in the Superior Court and is deemed waived. See *Albert v. Municipal Ct. of Boston*, 388 Mass. 491, 493-494 (1983); *Foxboro Harness, Inc. v. State Racing Commn.*, 42 Mass. App. Ct. 82, 85 (1997)." *M.D.*, *supra* at 476 n.28.

d. G.R. contends that DDS failed to comply with the certifica-

tion requirement of the *Ricci III* disengagement order.[12] However, as we determined in *M.D.*, *supra* at 468-469, the "unambiguous language of the order does not cover this type of interinstitutional transfer [footnote omitted]. The attorneys who crafted the consent decree were sophisticated attorneys who had dealt with each other for years; if they had wanted to include transfers between ICFs in the consent decree which was incorporated in the disengagement order, they could have done so. They did not." Moreover, "even if a certification was required and DDS's certification here was inadequate, we discern no prejudice at this point. In short, based upon our review of the entire administrative record, the magistrate's decision that the transfer to WDC would result in improved services and quality of life for [G.R.], and thus be in [his] best interest, was supported by substantial evidence. See G. L. c. 123B, § 3." *Id.* at 469.[13,14]

*Conclusion.* We fully recognize that there is a decidedly human component to this litigation and a deep and abiding responsibility to arrive at an outcome that is in the best interest of a severely intellectually disabled individual. We very much appreciate the compelling concern that the guardian has for the

[12]In DDS's answers to interrogatories signed under the pains and penalties of perjury by Linda Montminy, FDC's facility director (the successor title to the superintendent of FDC), DDS indicated that the former director of facilities, Diane Enochs (Montminy's boss), signed the certification. If it has not already done so, DDS should provide the guardian with a copy of the certificate as promised by DDS in its answers.

[13]We note that the guardian's argument that he has no "credible and official assurance that G.R.'s ISP required services will be met at [WDC]" ignores the magistrate's specific findings supported by substantial evidence that G.R.'s ISP objectives and requirements could be met at WDC; and that in fact, two of the objectives could be better implemented at WDC. These findings established that WDC was an "appropriate" facility as that term is defined by DDS regulation. See 115 Code Mass. Regs. § 2.01 (2009) (an "appropriate" facility is one that is "sufficient to provide the quality and quantity of staff, assistance, intervention, and environment to meet the individual's needs or objectives indicated in his or her Individual Service Plan [ISP].") Both the *Ricci* order and DDS regulations guarantee to class members the right to an *appropriate* residential environment.

[14]Lacking any reference to the appropriate regulatory standard, the guardian's passing challenge to the discovery order denying two of his twenty-two interrogatory requests does not constitute adequate appellate argument. We deem it waived. See *Cameron v. Carelli*, 39 Mass. App. Ct. at 86.

well-being of G.R. We do not in any way minimize that a transfer from FDC, where G.R. has spent nearly all of his life, will be a significant adjustment for both G.R. and the guardian. After review of the administrative record with the deference we are required as an appellate court to give the determinations of the fact finder, *Hanover Ins. Co.* v. *Commissioner of Ins.*, 443 Mass. at 50, we conclude that the magistrate's decision that the transfer from FDC to WDC is in G.R.'s best interest was supported by substantial evidence and free from error of law. See G. L. c. 30A, § 14(7). As earlier noted, we strongly urge that G.R.'s ITP team and DDS act upon G.R.'s request that the tub he will use be switched from a spa tub to a traditional one. We are mindful that G.R.'s ISP is subject to an annual, or even more frequent, review, see note 6, *supra*, and expect — as can the guardian — that this ongoing process will be used to address any issues that arise. Accordingly, we affirm the judgment of the Superior Court affirming DALA's transfer decision.

*So ordered.*