M.A.K.[1] *vs.* DEPARTMENT OF DEVELOPMENTAL SERVICES & another.[2] No. 11-P-2174. April 1, 2013. *Department of Developmental Services. Intellectually Disabled Person. Administrative Law,* Agency's interpretation of regulation. *Notice.*

The guardians of M.A.K., a profoundly intellectually disabled individual, appeal from a judgment of the Superior Court affirming the decision of the Division of Administrative Law Appeals (DALA) approving the decision by the Department of Developmental Services (DDS) to transfer their ward from the Fernald Developmental Center (FDC) to the Wrentham Developmental Center (WDC).[3] We reverse.

DDS regulations encourage participation by the family and the guardians in all aspects of the individual support plan (ISP) process and impose the duties, among others, upon them to provide ongoing feedback to the service coordinator and to the providers regarding their satisfaction with the ISP, its implementation, and the need for modification. See 115 Code Mass. Regs. §§ 6.20(4) and 6.21(4)(d) (2009). DDS is required by its own regulations to invite the family and guardians, among others, to the individual transition plan (ITP)/ISP modification meeting. See 115 Code Mass. Regs. § 6.25(4)(a) (2009). DDS is also required to "provide reasonable assistance and accommodations to enable the individual and other members of the ISP team to participate meaningfully in the . . . modification of the ISP." 115 Code Mass. Regs. § 6.21(2) (2009). These regulations "carry the force of law" and where, as here, no challenge to their validity is made, they must be enforced. See *Molly A.* v. *Commissioner of the Dept. of Mental Retardation*, 69 Mass. App. Ct. 267, 277 n.17 (2007).

Here, by certified letter dated June 9, 2010, Diane Enochs, the DDS assistant commissioner of facilities management, notified M.A.K.'s guardian, Loretta Ann Zannis, that (1) M.A.K.'s ISP team had recommended WDC as M.A.K.'s new home, and (2) an ITP/ISP modification meeting had been scheduled for June 22, 2010.[4] As of that date, M.A.K. had lived at the FDC

---

[6]Trooper Foley testified that he had recovered between ten and twelve firearms hidden in motor vehicle "hides."

[1]By her coguardians, Loretta Ann Zannis (M.A.K.'s niece) and Cheryl Norton (M.A.K.'s grandniece).

[2]Division of Administrative Law Appeals.

[3]A rehearsal of the efforts to close the Fernald Development Center (FDC) and the procedures established to effect the transfer of the current residents is set out in general terms in our discussion in *M.D.* v. *Department of Developmental Servs.*, *ante* 463 (2013).

[4]A change in the location of a ward's residence is a modification of an ISP, triggering rights and duties under DDS's ISP regulations. See 115 Code Mass. Regs. § 6.25(2)(e) (2009).

for sixty years, and the FDC closure process had been ongoing for seven years. Although the guardians had received previous correspondence from DDS asking them to participate in the planning process, this was their first notice of any plan to send M.A.K. to WDC. Enochs informed Zannis of her right to reschedule the meeting on reasonable notice up to two business days before the meeting, stating that requests to reschedule "will be honored to the extent possible" and that if Zannis was unable to attend a meeting on that date, Chris Oliveira, the ITP Coordinator, "will assign a new meeting date to accommodate your needs." Consistent with DDS regulations, Enochs strongly encouraged the guardians to become involved in the "critical planning process," noting that "the result of the meeting will be [DDS]'s final placement decision for [M.A.K.]."[5] Enochs asked Zannis to contact Oliveira to make appropriate arrangements.

As invited by the letter, Zannis called Oliveira and timely asked for a new meeting date due to her inability to secure time off from work on June 22, 2010. Although Zannis provided Oliveira with other workable dates in July, Oliveira refused to reschedule the meeting, stating "[July] was too late [and] that they were going to have the meeting with or without her."

In fact, DDS held the ITP/ISP modification meeting by conference call on June 22, 2010. At the meeting, fifteen DDS employees discussed M.A.K.'s needs, issues, and supports, and established a transition schedule. The guardians' interests were not represented.

In a follow-up letter to Zannis dated June 23, 2010, Oliveira claimed that she was unable to accommodate Zannis's request because the only possible alternative dates in July suggested by Zannis were beyond the *projected* FDC closing date of June 30. In her defense at the DALA hearing, Oliveira claimed she was just following the orders of her supervisor (Enochs) to complete the meetings by June 30.[6]

No good reason has been made to appear why DDS refused to provide reasonable accommodation as required by its regulations in the form of a short continuance. ITP Coordinator Oliveira's offer to recap the discussion that took place at the meeting was no substitute for the guardians' fundamental right to attend the meeting and to participate in the final decisions about where to place M.A.K. and how to ease her transition. The guardians were never given the opportunity to present their concerns and objections before the

[5]The initial contention by DDS's attorney that the final placement decision was made *before* the June 22, 2010, meeting, and that the meeting was therefore not significant, is at odds with Enochs's statement in the letter, DDS practice, and DDS regulations. See 115 Code Mass. Regs. § 6.25(7) (2009). If the June 22, 2010, meeting was held just to go over final details of a transfer decision already made without guardian input, it would raise serious due process concerns. (DDS reversed its position in its postargument submission, acknowledging that the final agency decision occurs *after* the meeting.)

[6]A high-level administrator, Oliveira admittedly knew for a variety of reasons that FDC would *not* be closing on that projected date set by executive branch administrators back in 2008. These reasons included both the pending transfer appeals and the future transfer proceedings, as well as M.A.K.'s proposed transfer date of August 25, 2010. See 115 Code Mass. Regs. § 6.63(3) (disallowing involuntary transfers until at the earliest, as herein relevant, DDS prevailed at the adjudicatory proceeding held at the Division of Administrative Law Appeals [DALA]). Moreover, as the guardians pointed out, their forty-five day period for weighing the merits of the proposed transfer did not commence until June 23, 2010. See G. L. c. 123B, § 3, and 115 Code Mass. Regs. § 6.63(2) (2009).

final agency decision issued. A guardian should not have to wait until the DALA phase of the process to be heard. We think that these violations of essential rights flowing from DDS's disregard of its own regulations constituted reversible error.[7] See *DaLomba's Case*, 352 Mass. 598, 603-604 (1967). See also *Rivas* v. *Chelsea Hous. Authy.*, 464 Mass. 329, 339 (2013). Even if prejudice to substantial rights was required, such a showing is manifest in the record as this meeting was a critical one in the transfer process.[8]

The judgment is reversed, and a new judgment is to enter vacating DALA's decision.

*So ordered.*

*Stephen M. Sheehy* for the plaintiff.

*Timothy J. Casey*, Assistant Attorney General, for the defendants.

---

[7]Where, as here, an appellate issue may be decided by reference to rights created by agency regulations, there is no need to reach the constitutional due process issues. See *Manor* v. *Superintendent, Mass. Correctional Inst., Cedar Junction*, 416 Mass. 820, 824 (1994).

[8]For example, Zannis, M.A.K.'s guardian, was not given the opportunity to advocate for her aunt on this issue or any other. The record does not support the notion that Zannis was the uncooperative guardian DDS portrayed her to be. Although the guardians refused to become involved in the earlier stages of the transfer process, by June, 2010, they were actively seeking to exercise their right to participate in the transfer decision. Zannis testified that she was willing to look again at WDC and to discuss community placement if certain assurances were made. Additionally, M.A.K.'s ITP called for only two transitional visits by the WDC team to FDC to observe M.A.K. being cared for by her familiar staff (and two visits by M.A.K. to WDC). Nancy Perrotti, the ITP nurse at FDC, testified that if she had attended the ITP/ISP meeting (instead of her assistant), she would have advocated for more visits. According to Perrotti, who is familiar with M.A.K., even though M.A.K. is very social and receptive to people, it takes time to understand her nuanced method of communication which involves gestures and sounds.

