# M.M.[1] *vs.* DEPARTMENT OF DEVELOPMENTAL SERVICES & another.[2]

No. 12-P-1592.

Middlesex. June 11, 2013. - February 18, 2014.

Present: BERRY, KATZMANN, & RUBIN, JJ.

*Department of Developmental Services. Intellectually Disabled Person. Administrative Law,* Hearing, Findings, Substantial evidence. *Guardian. Notice.*

Substantial evidence supported the ultimate conclusion of an administrative magistrate in the Division of Administrative Law Appeals approving the transfer by the defendant Department of Developmental Services of the plaintiff from one intermediate care facility for intellectually disabled persons to another such facility (i.e., that the transfer would result in improved services and quality of life for the plaintiff and would be in his best interest, and in particular that there will be sufficient space for the plaintiff in the new facility). [814-819]

There was no merit to the claim of the plaintiff's guardians that the defendant Department of Developmental Services (department) decided to transfer the plaintiff from one intermediate care facility for intellectually disabled persons to another such facility without involving his guardians [819-820]; further, any defect in the statutory notice sent to the plaintiff's guardians by the department concerning the transfer did not constitute prejudicial error [820].

At a hearing on the transfer by the defendant Department of Developmental Services of the plaintiff from one intermediate care facility for intellectually disabled persons to another such facility, an administrative magistrate in the Division of Administrative Law Appeals did not err in declining to consider the Federal law claims of the plaintiff's guardians. [820-821]

CIVIL ACTION commenced in the Superior Court Department on July 27, 2011.

The case was heard by *Bruce R. Henry*, J., on a motion for judgment on the pleadings.

*Stephen M. Sheehy* for the plaintiff.

---

[1]By his coguardians, Linda and Robert M.

[2]Division of Administrative Law Appeals.

*Iraida J. Alvarez*, Assistant Attorney General, for the defendants.

KATZMANN, J. Through his guardians, M.M., a profoundly intellectually disabled individual who resides at the Fernald Developmental Center (FDC), challenges a Superior Court judge's affirmance of the decision of the Division of Administrative Law Appeals (DALA) approving his transfer to the Wrentham Developmental Center (WDC).[3] See G. L. c. 123B, § 3. Our analysis here involves whether, during the DALA hearing, the Department of Developmental Services (DDS) presented the administrative magistrate with substantial evidence to support his decision that the interfacility transfer would result in improved services and quality of life for M.M. and be in M.M.'s best interest. After reviewing the administrative record and the parties' submissions, we affirm the judgment of the Superior Court approving DALA's decision. See G. L. c. 30A, § 14(7).

1. *Background.* M.M. is forty-nine years old and has resided at FDC since the age of five. He is profoundly intellectually disabled and cannot care for himself. He has nonspecified psychosis and suffers from episodes of anger and self-injurious behavior.

DDS has proposed to transfer M.M. from his residence at FDC to Heffron Hall B, apartment 3, at WDC. On June 10, 2010, DDS, as required by 115 Code Mass. Regs. § 6.63 (2009), issued a forty-five day notice and request for proposed facility transfer to M.M.'s guardians.[4] The guardians objected to the transfer, and DDS then referred the case to DALA. A DALA magistrate conducted an evidentiary hearing and concluded that DDS's proposed transfer of M.M. to WDC was in his best

---

[3]This case involves the proposed transfer of a long-time FDC resident from that facility to WDC. There is a discussion of FDC's upcoming closure and the accompanying reduction in staff in both *M.D.* v. *Department of Developmental Servs.*, 83 Mass. App. Ct. 463, 464 n.4 (2013) (*M.D.*); and *G.R.* v. *Department of Developmental Servs.*, ante 791, 792-793 (2014) (*G.R.*). M.M. is also a *Ricci* class member. See *Ricci* v. *Okin*, 823 F. Supp. 984 (D. Mass. 1993) (*Ricci III*). See also *M.D.*, *supra* at 467 & n.8. On the historic thirty-six year Federal District Court role in presiding over the institutional reform litigation, see Belin, Benchmarks XXIV The Life and Legacy of Joseph L. Tauro 67-81, 185-190 (Mass. Cont. Legal Educ. 2011).

[4]Neither the guardians nor DDS has proposed that M.M. be placed somewhere other than an Intermediate Care Facility (ICF).

interest. On July 19, 2012, a Superior Court judge affirmed the DALA magistrate's decision. M.M., through his guardians, then filed a timely notice of appeal to this court.

2. *Standard of review.* This is an appeal under G. L. c. 30A, § 14. By statute, therefore, we must review the conclusion of the administrative magistrate to determine whether it is supported by "substantial evidence." G. L. c. 30A, § 14(7)(*e*).[5]

3. *Findings of fact.* During the two-day administrative hearing, the magistrate heard from a number of witnesses[6] and then arrived at uncontested findings of fact, which we summarize. M.M. has been diagnosed with a psychiatric disorder — psychosis, not otherwise specified — which is treated with medication. He also has a seizure disorder which is controlled well with medication; his last recorded seizure took place in 2001. M.M. communicates through a combination of vocalizations, gestures, body movements, and a limited number of manual signs. He has exhibited physical aggression and self-injurious behavior since he was a young child. His aggression is unpredictable.

M.M. currently lives on the FDC campus in cottage 12B with three other men. He has lived with two of the men for many years, and he is compatible with all three of them. Until recently, cottage 12 housed fifteen residents. M.M. shares a bedroom with one of his housemates. Most of the staff in cottage 12B have worked with M.M. for many years and know his idiosyncrasies and can anticipate most of his wants and needs. M.M. is

---

[5]This standard is discussed in the context of an interfacility transfer pursuant to G. L. c. 123B, § 3, in *G.R., supra* at 794. See *M.D., supra* at 473.

[6]DDS presented testimony from the following individuals: Mark Lewis, Qualified Mental Retardation Professional (QMRP) at FDC; Anthony Gabriesheski, psychology assistant at FDC; Gail Lawrence, deputy facility director at Hogan Regional Center; Nicholas D'Aluisio, facility director at WDC; Sheila Advani, Ph.D., psychologist at WDC; Jennifer Stone, direct service worker 4 at WDC; Maureen Ethier, RN supervisor and ITP (Individual Transition Plan) placement nurse at WDC; and Gale Conley, Heffron Hall unit director at WDC.

The guardians presented the testimony of the following witnesses: Mary Ann Killilea, M.M.'s former QMRP at FDC, who worked with him for twenty-seven or twenty-eight years; and M.M.'s mother and guardian.

In addition, the parties jointly submitted sworn testimony (direct and cross-examination) of Gail Lawrence, Nicholas D'Aluisio, and the redacted testimony of James M. Waters, Jr., Ph.D., director of psychology at WDC, which testimony they all gave in another case.

free to walk around his residence and workplace, but outside of these two places, he must be closely watched. He requires one-to-one coverage in the community.

M.M. attends the Woodside day program, which is a five-minute walk from cottage 12B. He works from 9:30 A.M. to 2:30 P.M. with a one-hour break for lunch back in cottage 12B. The program consists of morning coffee runs, simulated bench work activities, and paper shredding. M.M.'s primary day-to-day relationships at FDC are with familiar staff. Some of the familiar FDC direct-care staff have transferred to WDC.

M.M. has three objectives in his individual support plan (ISP)[7] at FDC. The first is to put his clothes away after he removes them from the dryer and folds them. This objective is implemented by the direct care staff at FDC. M.M.'s second ISP objective involves identifying coins. The third ISP objective is to increase appropriate social behavior by helping M.M. remain 100 percent free of aggression for five of six months. This goal is implemented by all trained staff and is overseen by the psychology staff at FDC.

In its forty-five day notice letter to his guardians, sent on June 10, 2010, DDS provided the following justification for M.M.'s proposed move to WDC:

> "Members of [M.M.]'s ISP team have selected this specific site at the Wrentham Developmental Center for [M.M.] and are confident that the staffing, services, and amenities available at Wrentham will meet all of [M.M.]'s ISP needs. Wrentham Developmental Center has a state-of-the-art acute care medical facility, workshops, a heated indoor Olympic size pool, a full size gymnasium, modern exercise equipment, and a full range of clinical services in the areas of medicine, nursing, psychology, recreation,

---

[7] An ISP, which is also known as an individual support plan, is an annually reviewed document based on assessments by professionals who work with a resident and input from his or her family and guardians that describes his or her current clinical situation, objectives in areas such as health, cognitive development, independent living skills, and social development, and supports to be utilized to assist the individual in obtaining those goals. See 115 Code Mass. Regs. §§ 6.20-6.25 (2009). Importantly, after a resident moves into a few facility, there is an assessment process for the first thirty days. Afterwards, the facility staff meet to determine if any modifications to the ISP are necessary.

social services, occupational and physical therapy, communication, adult education, vocational services, orientation and mobility services, and adaptive physical education. Although the Fernald Center is closing and will no longer be available as a residential option, Wrentham Developmental Center is a Title XIX certified facility offering continuity of services and supports for [M.M.] and the proposed move to Wrentham will result in improved services, supports and quality of life for him."

At Heffron Hall, where DDS proposes to move M.M., there are currently forty-four residents, all of whom lived at FDC until June 2010, when they began moving to WDC. In Heffron B, apartment 3, M.M. would live with familiar peers. Of the four residents currently living in the apartment, three of those men are M.M.'s former FDC housemates. There is a den in the apartment where M.M. could spend quiet time alone, or he could stay in the living room so that he could observe the other residents. There is less space for the residents in Heffron Hall than there is in cottage 12B.

Three hundred twenty-five residents now live on WDC's 400-acre campus. There are 1,000 employees staffed at the facility; sixty-two of them transferred from FDC. The facility includes the Quinn Center, which houses workshops, a pool, a library, a gymnasium, and classrooms; and the May Center, a new medical facility, infirmary, and rehabilitation center that is staffed by four primary care doctors and four nurse practitioners. WDC has eight psychology staff members, who spend half of their time at the residences and program areas where they implement, train, and observe the implementation of the residents' behavior plans. Finally, WDC also offers twenty-four hour nursing to the residents at Heffron Hall B.

At WDC, M.M. would participate in a day program at the Quinn Building which is similar to his day program at FDC. He would have additional vocational opportunities, if he is so inclined. On the lower level of Heffron Hall, there are washers and dryers, which M.M. could use to work on his ISP objective to do his laundry. In the evenings, M.M. would have a number of activities at WDC from which he could select, including

karaoke, socials, sing-alongs, movies, and concerts. WDC's recreation staff organizes facility-wide activities on the weekend, in addition to the regular weekly activities. Notably, WDC employs many staff with whom M.M. was familiar at FDC.

4. *Evidence supporting decision.* As noted above, the primary issue in this appeal is whether DDS provided the magistrate with substantial evidence to determine that transferring M.M. from FDC to WDC is in his best interest. We determine that substantial evidence supported the magistrate's ultimate conclusion that the transfer will result in improved services and quality of life for M.M. and will be in his best interest. See G. L. c. 123B, § 3. As required by the statutory standard, the magistrate compared the offerings of the two facilities and weighed the benefits of the transfer against the disadvantages. The magistrate properly noted that there are many similar features that do not distinguish WDC from FDC: (1) both facilities are certified under Title XIX of the Social Security Act, codified at 42 U.S.C. § 1396-1 (Supp. IV 2010); (2) both facilities have the capability to implement M.M.'s ISP; and (3) both facilities are staffed by dedicated individuals who are caring and more than capable of providing services needed by M.M. and other residents.

In his determination that M.M. would benefit from the transfer, the magistrate relied upon the testimony from several clinicians and professional staff members, such as Dr. Sheila Advani (psychology assistant at WDC), Maureen Ethier (registered nurse and supervisor at WDC), Mark Lewis (M.M.'s Qualified Mental Retardation Professional [QMRP]), and Anthony Gabriesheski (psychology assistant at FDC for twenty-nine years). See note 6, *supra.* After hearing two days of testimony, the magistrate made the following, uncontroverted findings based upon substantial evidence:

> "Wrentham offers improved services in the form of medical care (much larger psychology staff, 24-hour nursing, available psychiatrists), day programs (expanded options for work and other available activities), and a staffing regimen that encourages many different types of staff to interact directly and routinely with residents. Wrentham also offers a potentially improved quality of life in the form of an apartment with more activity (more staff and

familiar residents), and wider and more frequent opportunities for recreational activities.

> "Although [M.M.] may not need, at the moment, all the medical services Wrentham has to offer and may not choose to take advantage of all the work, recreational, and social opportunities offered, the availability of additional medical services is an improvement for a person with his medical needs and the additional work, recreational and social options have the potential to enhance [M.M.]'s quality of life."

Thus, there is no doubt that M.M. will receive improved medical and psychological care as well as improved recreational and work opportunities.

Additionally, as briefly noted above, WDC offers M.M. the significant benefit of familiar residents as he will be reunited with three of his former housemates from FDC. At the time of the DALA hearing, M.M. had lived with two of the residents of his apartment — including his roommate — for at least fifteen years, and the third roommate for only a few months. If transferred to WDC, M.M. would live with the same roommate that he now has at FDC. The benefit of this living arrangement has been acknowledged by both M.M.'s caregivers as well as his guardians.

On appeal, the guardians' primary concern is that there will be insufficient space in M.M.'s new apartment at Heffron Hall and that as a result of the lack of space, M.M. will have an increase in his episodes of aggression. Consequently, the guardians contend that DDS's only solution to deal with the episodes of aggression will either be to isolate M.M. from the rest of the residents in the small den or to increase the use of physical or chemical restraints.

On the one hand, the magistrate found that "[t]here is no question that the Heffron Hall space is smaller than the space at Cottage 12, particularly when considering that Cottage 12 has only a few other residents." However, the magistrate emphasized that "there is no claim that the space provided fails to meet any Title XIX or other standard." Thus, the primary question is whether there is sufficient space to prevent M.M.'s aggressive

episodes. We believe that the DALA magistrate received substantial evidence to support this determination.[8]

To begin with, both Jennifer Stone, see note 6, *supra,* and Mark Lewis testified that there would be sufficient space for M.M.. Stone provided the following testimony:

> "I've kind of looked around, and the way the day room is set up, we have, you know, the television, and then we have a couch here and another couch across on the other side, and it's adjacent to, like — I call it a sunroom. I don't know if people call it that. It's — it's off of the, you know, living room, and it has, like, a big picture window and a big door, and I — I can see [M.M.] like choosing to put his chair there so that he — he would still have his back against the wall, but he would still be able to see everything that's going on around him . . . . I think it would be a good, you know, place for [M.M.], but it's my opinion."

Additionally, Lewis stated that "there's spaces where [M.M.] would have sufficient personal space."

Finally, and perhaps most importantly, Gale Conley, who is the unit director at Heffron Hall and oversees the day-to-day services as related to the ISP for each individual, testified as to the following:

> "Well, you know, he wants to have his back to the wall, so I think that we would, you know, we would try to offer a couple different options for him, of course, with the involvement of hopefully the guardian at that point, and some of the staff who are familiar with him now, and then staff who are actually familiar with him that are at Wrentham now, too."

---

[8]We note that the magistrate heard testimony during the two-day hearing as to the following uncontested facts about M.M.'s need for personal space. M.M. does not like when people get too close to him. He generally does not appreciate anyone coming within an arm's length of him and prefers to sit by himself. At FDC, he always sits in a chair behind one of the couches with his back against the wall. M.M. enjoys sitting in his chair and observing his housemates. These facts, though not included in the magistrate's recitation, provide further context to the magistrate's ultimate decision to approve of the transfer.

Thus, DDS presented substantial evidence that not only will there be sufficient space for M.M. in his new apartment, but also that they will work both with him and with his guardians to ensure that M.M. is satisfactorily accommodated in his new apartment.

M.M.'s guardians, however, take issue with the following finding by the magistrate:

> "Keeping [M.M.] in an environment where he has minimal social interaction only temporarily avoids addressing [M.M.]'s aggressive behavior and actually makes implementing [M.M.]'s ISP objective to increase appropriate social behavior more difficult. On balance, it will be better for [M.M.] to be back in an environment where he has a roommate and some peers surrounding him."

While this language is susceptible to differing interpretations, we think that it is best understood as follows: since M.M.'s ISP objective of increasing appropriate social behavior by helping him to remain free of aggression is premised on his interaction with peers, then moving him to an environment where he will have more such social interaction (in contrast to his present living situation where he has only minimal interaction) will further, a fortiori, that goal.[9] M.M.'s ISP calls for

---

[9] An alternative, less persuasive reading is that M.M.'s aggression would be reduced automatically by living in a more active apartment with more people, setting aside the professional management of his case by the staff at WDC. When addressing the frequency of M.M.'s aggressive episodes, Gabriesheski, the only remaining psychology assistant at FDC, explained that "[w]e have had a recent escalation over the last two to three months. He went from zero incidents to nine incidents a month in August; nine incidents in September; but back to down four in October." Then, Gabriesheski provided the following theory in an effort to explain this increase in aggressive episodes:

> "We're thinking that it actually may be due to the fact that he's in an apartment now with just a few peers; and since most of his behavior seems to be attention-seeking, that there's — it's — he is observant. That's what he does. That he may have decided that there's more of an opportunity to — for staff to see him when he does something. Otherwise, you know, if you're in a group with ten others or five others or eight others, you know, it may not occur to you that, 'Geez, if I stand up, someone —' or intervene."

When pressed on this explanation and asked whether it was in fact his profes-

reducing his aggressive behavior and increasing appropriate social behavior, and surely, DDS should pursue any strategy that minimizes M.M.'s aggression. All the staff involved in the transition have determined that, while there will be less space for M.M. at WDC than there was at FDC, there will be sufficient space for him to thrive and work towards remaining aggression-free. When understood in context of his entire analysis, the magistrate effectively concluded that the proposed accommodations at WDC that would cause M.M. to face the continuing challenge of social interaction, together with the professional caregiving and guidance that WDC provides — despite the reduction in square footage allotted to him — will enable an increase in appropriate social behavior, not of aggression.

The magistrate was not required to credit the guardians' testimony to the effect that M.M. would not have sufficient space in his new apartment.[10] In any event, the magistrate could reasonably have concluded that even if valid, the guardians' concern about the smaller space was outweighed by the other benefits of transfer. In the end, the guardians did not present any evidence that DDS planned to isolate M.M. in the den of the new apartment or to increase the use of physical or chemical restraints. Thus, DDS presented substantial evidence to support the conclusion that there will be sufficient space for M.M. in WDC.[11]

---

sional opinion, Gabriesheski acknowledged it was a working theory rather than a proven conclusion:

> "Well, it's a work-in-progress because [M.M.] is difficult in terms of ascertaining why he does things. A lot of times there is no clear-cut reason. And if you look over years of — of data, the one thing that's striking is the variability of his behaviors. You can have no apparent environmental change, no staffing change, and yet behaviors can increase for a month; and the next, you can have zero."

Thus, the bottom line is that Gabriesheski and his colleagues do not know precisely what triggers the aggressive episodes. In short, Gabriesheski's testimony did not provide a basis to conclude that merely surrounding M.M. with additional peers would reduce his aggression.

[10]Guardian Linda M. provided the following testimony: "But the biggest concern was the minute we opened the door and went into Heffron, the space. . . . I said, this is going to the be the beginning of the end. He is going to be — his aggression, self-abuse, is going to be — because the space end of it."

[11]We also note that Killilea, one of the guardians' witnesses who took care

Additionally, the magistrate rejected the guardians' quality-of-life objection to the transfer of M.M. from the "home-like" cottage 12 environment to the institutional setting of Heffron Hall. As the magistrate noted, the question which placement was more home-like was a matter of perspective. The magistrate did not share the guardians' view here. Based on his review of several pictures of the respective ICF residences, he found that they looked "largely the same" (i.e. "relatively institutional"). He also noted that once all the residents move in with their belongings, apartment 3 will look more personalized.

Finally, M.M.'s guardians also contended that the new living arrangement is unsatisfactory because, from their station, the WDC staff at Heffron Hall will not be able to see into M.M.'s bedroom. Mary Ann Killilea, who worked with M.M. at FDC for many years, and is presently retired, raised this issue during her testimony at the administrative hearing. On direct examination, she explained that in her opinion it is "good to be able to see [the residents] during the night." However, during cross-examination, Killilea explained that M.M. is actually a very good sleeper and that it was just her personal opinion, or preference, that she "would want to be able to . . . see the bedrooms." When asked if there was a particular type of behavior that could arise at night that concerned her, Killilea replied, "No. Unless he is having a very bad night and he isn't sleeping and he is up tearing — taking [his roommate]'s blanket off of his bed, and then [his roommate] would go over and get that and then there would be World War II." The magistrate chose not to rely on this concern in his ultimate decision.

5. *Remaining issues.* The guardians present three additional arguments on appeal. None of the arguments provides grounds for relief, and we briefly address each argument below.

a. The guardians claim that DDS decided to transfer M.M. without involving his guardians. The record does not support this claim. DDS encouraged the guardians to become involved in the placement-planning process, inviting them to general informational meetings about placement options and open houses

of M.M. for twenty-seven or twenty-eight years, see note 6, *supra,* testified that at a prior residence at FDC, M.M. lived with a number of men in a small space.

as well as *individualized* planning meetings with respect to M.M. One of M.M.'s guardians testified that since she believed M.M. should stay at FDC, she "wasn't interested" and did not attend. Her hope was that the issue "would go away" and that M.M. could remain at FDC.

Any error in the failure of Lewis, M.M.'s QMRP, to convene or to run the Individual Transition Plan/ISP modification meeting as required by the DDS's regulation was harmless. See *Molly A.* v. *Commissioner of the Dept. of Mental Retardation*, 69 Mass. App. Ct. 267, 287 n.28 (2007). Both guardians attended that meeting and had the full opportunity to question Lewis and other ISP team members about the placement selection process, the risks to M.M., and possible alternatives to apartment 3.

b. The guardians' claim of error relating to the defective statutory notice is controlled by *M.D.*, *supra*. In that case, while construing a substantially similar form letter, we held that even if the notice did not satisfy the statutory and regulatory standards, any defect did not constitute prejudicial error. See *id.* at 471.

Here, M.M.'s guardians, like M.D.'s guardians, categorically objected to *any* transfer out of FDC, viewing the proposal as a threat to M.M.'s well-being. Regardless of what the notice said, the guardians were going to object to the transfer. Moreover, before the administrative hearing, DDS provided the guardians with detailed answers to interrogatories describing the many alleged improvements awaiting M.M. at WDC. Those answers also provided the guardians with specific information unavailable at the time the statutory notice was sent. There is no evidence to suggest that the ability of the guardians to prepare for the hearing was compromised in any way.

c. Finally, the guardians argue that the DALA magistrate failed to consider Federal law. However, we decided in *M.D.*, *supra*, that "[t]he administrative magistrate of DALA, an independent adjudicatory agency, properly read G. L. c. 123B, § 3, narrowly to limit his authority to determine whether the proposed transfer should proceed as in the best interest of [the ward] . . . . If the Legislature had intended for DALA to consider the guardians' Federal law claims in the context of a transfer

proceeding, it would have included appropriate language to this effect in the statute." *Id.* at 466.

6. *Conclusion.* We fully recognize that at the center of this poignant case is a human being who is a profoundly intellectually disabled individual. There is a compelling responsibility to arrive at an outcome that is in his best interest. We very much respect the powerful concern that the guardians have for the well-being of M.M. We do not in any way minimize that a transfer from FDC, where M.M. has spent nearly all of his life, will be a significant adjustment for both M.M. and the guardians. After review of the administrative record with the deference we are required as an appellate court to give to the determinations of the fact finder, *Hanover Ins. Co.* v. *Commissioner of Ins.*, 443 Mass. 47, 50 (2004), we conclude that the magistrate's decision that the transfer from FDC to WDC is in M.M.'s best interest was supported by substantial evidence and free from error of law. See G. L. c. 30A, § 14(7). We are mindful and appreciate that M.M.'s ISP is subject to review, at least annually, see note 7, *supra,* and anticipate — as can the guardians — that this safeguard will provide a forum to address issues that may arise. Accordingly, we affirm the judgment of the Superior Court affirming DALA's transfer decision.

*Judgment affirmed.*