E.G.[1] *vs.* DEPARTMENT OF DEVELOPMENTAL SERVICES
& another.[2]

No. 12-P-1560.

Middlesex. June 11, 2013. - February 18, 2014.

Present: BERRY, KATZMANN, & RUBIN, JJ.

*Department of Developmental Services. Intellectually Disabled Person.*
*Administrative Law,* Hearing, Findings, Substantial evidence. *Notice.*

At a hearing on the transfer by the defendant Department of Developmental
Services of the plaintiff, a profoundly intellectually disabled man, from the
Fernald Developmental Center to the Wrentham Developmental Center, the
plaintiff's guardians failed to demonstrate that they were denied a meaningful
opportunity to participate in the placement-planning process [835-836];
further, the transfer notice, even if defective, caused no prejudice to the
substantial rights of the plaintiff's guardians [836-837].

CIVIL ACTION commenced in the Superior Court Department on
July 7, 2011.

The case was heard by *Bruce R. Henry,* J., on a motion for
judgment on the pleadings.

*Stephen M. Sheehy* for the plaintiff.

*Carrie Benedon,* Assistant Attorney General, for the defend-
ants.

BERRY, J. The Department of Developmental Services (DDS)
seeks to transfer E.G., a profoundly intellectually disabled
individual, from the Fernald Developmental Center (FDC) to

[1]By his coguardians, Julie Leahy and John Galvin.
[2]Division of Administrative Law Appeals (DALA).

the Wrentham Developmental Center (WDC).[3] E.G.'s guardians oppose the transfer. Following an adjudicatory hearing on the guardians' objections, an administrative magistrate of the Division of Administrative Law Appeals (DALA) concluded that the proposed transfer met the requirements of the State statutory standard, allowing it to proceed. See G. L. c. 123B, § 3. A judge of the Superior Court subsequently affirmed DALA's decision. See G. L. c. 30A, § 14(7). We affirm.

E.G. currently resides at Cottage 12B on the FDC campus with three other individuals.[4] DDS's plan calls for E.G. to be reunited with a number of his former longterm housemates at Heffron Hall B, apartment 3, at WDC (apartment 3). Although E.G. does not interact with his peers, he successfully lived with that peer group for over twenty-five years.

We consider the claims and issues that are unique to E.G.'s individual circumstances.[5]

A finding that the transfer was in E.G.'s best interest was supported by substantial evidence. The vision section of E.G.'s 2009-2010 individual service/support plan (ISP) identifies the ability "to safely move about his home and workplace" as a hope and dream of the future, and "a stable home" as an aspect of his membership in the community. The living space at apartment 3, as compared to that at FDC, is indisputably smaller. Contrary to the guardians' assertions, however, the magistrate credited the testimony from DDS's witnesses that the personal

[3]Under twenty residents remain at FDC, which is closing. See *M.D.* v. *Department of Developmental Servs.*, 83 Mass. App. Ct. 463, 464 & n.4 (2013).

[4]E.G. was fifty-four years old at the time of the underlying proceedings. He has lived at FDC since 1969.

[5]Many of the arguments raised by E.G. have been considered and resolved in recent published opinions from this court, including *M.D.* v. *Department of Developmental Servs.*, 83 Mass. App. Ct. 463 (2013); *M.A.K.* v. *Department of Developmental Servs.*, 83 Mass. App. Ct. 906 (2013); *G.R.* v. *Department of Developmental Servs.*, ante 791 (2014); *M.M.* v. *Department of Developmental Servs.*, ante 809 (2014); and *P.D.* v. *Department of Developmental Servs.*, ante 822 (2014). The court has also decided the following involuntary transfer cases pursuant to Appeals Court Rule 1:28: *T.K.* v. *Department of Developmental Servs.*, 83 Mass. App. Ct. 1121 (2013); *C.T.* v. *Department of Developmental Servs.*, post 1102 (2013); and *Randall R.* v. *Department of Developmental Servs.*, post 1110 (2013).

space at apartment 3 would be adequate to meet E.G.'s needs.[6] As the magistrate noted, familiar psychology staff will be assigned to E.G. at apartment 3, and they, in conjunction with familiar direct care workers who have transferred to that apartment, have a proven track record of successfully managing E.G.'s behavioral challenges.[7] The magistrate did not find that the apartment was inappropriate or unsafe.

It is unclear how E.G. will react to the transfer and how he will adjust to apartment 3. DDS has the duty to properly implement E.G.'s ISP. The magistrate appropriately reminded staff of their responsibility to reevaluate the space once E.G.'s actual reaction to it is gauged and to correct any safety or ISP-related inadequacy in a reasonable amount of time.

As required by the transfer statute, the magistrate considered the guardians' concern about DDS's lack of transitional planning if, as they anticipate, E.G. refuses to enter Heffron Hall B, an unfamiliar, two-story brick building, or its elevator.[8] Substantial evidence supported the magistrate's finding that a better

---

[6]Anthony Gabriesheski, who provides psychological services to E.G., testified that E.G. needs sufficient space for his rocking chair in a location from which he can watch ongoing activities (a preferred leisure activity); that there are places in the apartment that would be suitable to place the chair; and that the space in apartment 3 will be adequate. Mark Lewis, E.G.'s Qualified Mental Retardation Professional, also known as the "Q" or the service coordinator, opined that the space is appropriate and will meet E.G.'s needs.

[7]The magistrate found, consistent with the evidence, that E.G.'s incidents of aggression, noncooperation, and bolting have declined over the last several years. In fact, E.G. met his ISP objective of reducing assaultive behavior in 2009. Gabriesheski further testified that as a result of the changes the ISP team had observed in E.G., he believed that E.G. would have *less* difficulty with the transition than originally anticipated at the time the team developed E.G.'s individual transition plan (ITP). Gabriesheski and Lewis both testified that E.G. had surprised staff by adjusting well to the many recent changes in his life arising from the wind-down of FDC, including the loss of longtime familiar staff, peers, changes in the location of his day program, and scheduling changes.

[8]E.G. is easily frightened, particularly of that which is unfamiliar. He has become agitated, uncooperative, and belligerent at diverse times, places, and events. Mary Ann Killilea, who worked with E.G. at FDC for twenty-seven or twenty-eight years, testified that even surrounded by familiar staff and provided with positive reinforcement, E.G., who is unpredictable, may or may not enter Heffron Hall B of his own volition at some point; and that she would return for multiple days for as long as it took to get him into the building. In her opinion, E.G. does not like brick buildings, which he seems to associate with

"paper plan" would not make any difference and that given the inability to predict the nature and extent of E.G.'s reaction in advance, an ad hoc and flexible planning approach was necessary.[9,10]

The guardians failed to demonstrate that they were denied a meaningful opportunity to participate in the placement-planning process. They declined to attend open houses or to visit other DDS facilities and summarily rejected a number of possible placement options identified by DDS before apartment 3. Their response to DDS's numerous invitations to become involved in the placement-planning process was to insist that E.G. should remain at FDC maintained as an Intermediate Care Facility (ICF). As DDS moved forward with the closure of FDC following *Ricci* v. *Patrick*, 544 F.3d 8 (1st Cir. 2008), cert. denied, 556 U.S. 1166 (2009) (*Ricci V*), DDS specifically advised the guardians that if they declined to participate in the selection process, members of the ISP team would choose an appropriate placement for E.G. As the magistrate found, notwithstanding *Ricci V*, they continued to oppose the closure. Since the guardians knowingly chose not to become involved, that cannot now complain that the placement recommendation was made in secret.

The guardians claim that the ITP (individual transition plan)/ISP modification meeting held as required by 115 Code Mass. Regs. §§ 6.25(2)(e) and 6.25(4) (2009) was a "sham." We disagree with this characterization. Based on the input of the guardians at the meeting, changes were made to the planning documents. Even if Mark Lewis, E.G.'s service coordinator,

doctors and dentists. Depending on his mood and the day, E.G. may act out at the entrance of any unfamiliar building. Although the magistrate found that E.G. had initially resisted entering an elevator at FDC, he noted that DDS staff had persuaded him to do so. Gabriesheski and Lewis opined that E.G. will be able to use the Heffron Hall B elevator without problems.

[9]The magistrate recognized the progress FDC staff had made in mitigating E.G.'s behavioral problems through approaches such as waiting out his refusal to enter a new building or to change a routine, and concluded this was the best approach for introducing E.G. to Heffron Hall B. The magistrate further noted that adjustments to the transition plan may be required during implementation.

[10]According to Gabriesheski, any behavioral problems, including aggression toward staff or reluctance to enter the Heffron Hall building or the elevator, will be handled in accordance with the procedures specified in E.G.'s health and safety support plan.

was not the individual who convened and facilitated the ITP/ISP modification meeting, as the regulations specify, the guardians have not demonstrated potential prejudice to their substantial rights from any regulatory violation.[11] See 115 Code Mass. Regs. § 6.21(5)(f) (2009); *Molly A.* v. *Commissioner of the Dept. of Mental Retardation*, 69 Mass. App. Ct. 267, 287 n.28 (2007). Contrary to the guardians' assertion, the undisputed evidence showed that Lewis was part of the ISP team that made the transfer recommendation. Moreover, Lewis, among other team members, attended the ITP/ISP modification meeting and was available for questioning by the guardians regarding his role, the process, and the ISP team's placement recommendation for E.G.[12]

We conclude, as did the magistrate and the judge, that DDS's July 1, 2010, transfer notice satisfied the requirements of G. L. c. 123B, § 3, and 115 Code Mass. Regs. § 6.63(2)(c) (2009). Only one deficiency in content is claimed — the alleged absence of a statement about how the proposed move will result in improved services and quality of life for E.G. Although the notice contained the same boilerplate and generic information about WDC found in other transfer notices, it also contained specific details showing some alleged benefits of a transfer to E.G.[13] Contrast *M.D.* v. *Department of Developmental Servs.*, 83 Mass. App. Ct. 463, 471 (2013). The notice also invited the guardians to contact the facility director and the assistant facility director of WDC for further information.

Even if the notice was defective, the guardians suffered no prejudice to their substantial rights. See *ibid.* As previously

[11]Christine Oliveira, the FDC placement coordinator, chaired the meeting.

[12]The guardians declined to consider a community-based placement for E.G., who suffers from many serious behavioral and medical conditions as well as from Alzheimer's disease. The placement of E.G. in a second-floor apartment will discourage E.G.'s bolting behavior. The doors at apartment 3 are kept locked or alarmed for the safety of the residents, arguably a critical feature for a mobile resident with Alzheimer's. According to Killilea, staff kept the doors locked at E.G.'s former residence at FDC to prevent E.G. from bolting.

[13]For example, the notice indicated that E.G. will be referred to the adaptive physical education (APE) department at WDC to address his weight issues and, assuming medical clearance, an evaluation for exercise services. FDC does not have an APE department.

noted, the guardians continued to oppose FDC's closure even after *Ricci V* was not subject to any further appellate review. Substantial evidence supported the magistrate's finding that regardless of what the notice said, the guardians had no intention of consenting to the transfer.[14]

Finally, substantial evidence supported the magistrate's ultimate finding that the transfer will result in improved services and quality of life for E.G. See G. L. c. 123B, § 3. In a fair and balanced manner, the magistrate considered all of the alleged benefits identified by DDS, rejecting many as hypothetical, theoretical, or aspirational only. He also acknowledged the downsides of the move and the legitimacy of some of the guardians' concerns. In assessing the overall picture, he found that any detriment was outweighed by the significant benefits of the transfer. These benefits included reunification with Rick Tulipano, his former Q, and continuity of services from Gabriesheski, who together with E.G.'s Q had developed the ISP identifying the services and supports E.G. needs; and improvements in medical and psychological services, which the magistrate found essential in view of E.G.'s Alzheimer's disease, an incurable degenerative brain disease,[15] and its associated health and behavioral issues.

The magistrate's seventy-nine page decision shows that he conscientiously parsed through the significant amount of evidence before him, compared the offerings of the respective facilities, and considered the guardians' many objections. As the fact finder charged with discerning what was in E.G.'s best interest, he was entitled to weigh each piece of evidence, to make credibility determinations, and to draw reasonable inferences from the evidence (or not to draw them). See *Duggan* v. *Board of Registration in Nursing*, 456 Mass. 666, 674 (2010). Our review here is circumscribed. "Under the substantial evidence test a reviewing court is not empowered to make different credibility choices, or to draw different inferences from the facts found by

---

[14]In their ten-page, single-spaced objection letter to DDS, the guardians stated, that if moved out of FDC to any other placement, E.G. will suffer irreparable physical and emotional harm, great pain, and possibly death.

[15]The magistrate relied on the definition of Alzheimer's disease set forth in *Matter of Dinnerstein*, 6 Mass. App. Ct. 466, 466-467 (1978).

the [magistrate]." *Pyramid Co.* v. *Architectural Barriers Bd.,* 403 Mass. 126, 130 (1988), quoting from *Medi-Cab of Mass. Bay, Inc.* v. *Rate Setting Commn.,* 401 Mass. 357, 369 (1987). See G. L. c. 30A, § 14(7). In determining whether the decision was supported by substantial evidence, the focus of the appeal, we are not permitted to overrule those choices or to substitute our view of the facts for the magistrate's view.

We appreciate that this significant change in E.G.'s life is of great concern to his guardians. We are aware that they have endeavored to insure E.G.'s well-being. After careful review, we conclude that the magistrate's decision that E.G.'s transfer from FDC to WDC meets the standard of G. L. c. 123, § 3, is supported by substantial evidence.

The judgment of the Superior Court affirming the decision of DALA to approve the transfer of E.G. is affirmed.

*Judgment affirmed.*