NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

12-P-1760                                        Appeals Court

   J.W.[1]  vs.  DEPARTMENT OF DEVELOPMENTAL SERVICES & another.[2,3]


                        No. 12-P-1760.

      Middlesex.     June 2, 2014.  -  September 24, 2014.

           Present:  Green, Trainor, & Grainger, JJ.

Division of Administrative Law Appeals.  Department of
     Developmental Services.  Intellectually Disabled Person.
     Administrative Law, Judicial review.  Statute,
     Construction.



     Civil action commenced in the Superior Court Department on
September 15, 2011.

     The case was heard by Douglas H. Wilkins, J., on a motion
for judgment on the pleadings.


     Timothy J. Casey, Assistant Attorney General, for the
defendants.

------------------------------

     [1] By his coguardians, Diane W. McDonald and Teresa W.

     [2] Division of Administrative Law Appeals.

     [3] This court previously issued an opinion in this case.  See
J.W. v. Department of Developmental Servs., 84 Mass. App. Ct.
340 (2013).  A motion for rehearing was allowed, and that
opinion was withdrawn pursuant to an order of this court.  The
case was reheard by a different panel, and this opinion follows
that rehearing.

Stephen M. Sheehy for the plaintiff.

TRAINOR, J.  The Department of Developmental Services (DDS) appeals from a Superior Court judgment that vacated the decision of the Division of Administrative Law Appeals (DALA) approving the transfer of J.W. under the provisions of G. L. c. 123B, § 3.[4]

J.W. is a profoundly mentally disabled, visually impaired, and nonverbal individual.  He has little or no concept of personal safety, and therefore, while he can walk independently, he cannot negotiate stairs alone.  He has been a resident at the Fernald Developmental Center (FDC or Fernald) for nearly his entire life.  The FDC is in the process of closing, however, and the policy decision to transfer its residents, all intellectually disabled individuals, to other appropriate care

_____

[4] The Superior Court judgment also remanded the case to DALA for further proceedings.  "An order of remand, by its nature, is generally not final, particularly when the operative verb in the order has been 'reconsider.'" Federman v. Board of Appeals of Marblehead, 35 Mass. App. Ct. 727, 729 (1994).  However, "[i]f an order of remand allows the administrative tribunal no leeway, the order takes on the character of finality, and an appeal is in order." Id. at 730.  Here, the Superior Court decision does allow DALA leeway in the ultimate disposition of the case.  However, the Superior Court has mandated that DALA consider various alternative placements for J.W. based upon a novel interpretation of the statutory requirements for implementing a transfer under G. L. c. 123B, § 3.  This interpretation was dispositive in the Superior Court decision.  In these circumstances, we will address the issue of law concerning statutory interpretation.

facilities is no longer subject to review by the Federal courts and would require a change in State law to prevent.[5]

In a comprehensive and balanced decision, an administrative magistrate of the DALA approved the plan proposed by the DDS to transfer J.W. from his residence at Malone Park 23 at the FDC to Heffron Hall A, apartment 4 at the Wrentham Developmental Center (WDC). See G. L. c. 123B, § 3.

A judge of the Superior Court, on review, concluded that "[i]f one accepts the Magistrate's legal rulings -- essentially limiting inquiry to a choice between Fernald and Heffron Hall -- then there is no lack of substantial evidence for the Decision. Nor (on the same assumption) does the Court find any error in 'the logic of the analysis that the hearing officer articulated in [his] decision.' Covell v. Department of Developmental Servs., 439 Mass. 766, 782 (2003)." Despite that, the judge concluded that the magistrate erred in his legal ruling by limiting his consideration of J.W.'s best interest to either the existing placement at Fernald or the single alternative proposed by the DDS.

On the basis of this legal error, the judge ordered DALA's decision vacated and remanded the matter to DALA for further

---

[5] Ricci v. Patrick, 544 F.3d 8, 19 (1st Cir. 2008), cert. denied, 556 U.S. 1166 (2009) (disengagement order did not guarantee to class members a particular residential placement, nor must the FDC be maintained by the DDS so long as any resident wishes to remain there).

proceedings.  This appeal followed.  Although we agree with the judge's conclusion that substantial evidence supported DALA's decision, we disagree with his statutory construction. Accordingly, we vacate the judgment of the Superior Court and remand the case for entry of a judgment affirming DALA's decision.

Discussion.  This appeal is based upon an issue of statutory interpretation; therefore we set out the terms of the governing transfer statute, G. L. c. 123B, § 3,[6] in some detail. The transfer statute provides a specific process that must be followed by DDS in every case where it seeks to transfer an intellectually disabled individual "from one residential facility for the intellectually disabled to another."[7]  G. L.

---

[6] At the time DDS proposed this transfer of J.W., the prior version of the statute was in effect.  As a result, that version of the statute (G. L. c. 123B, § 3, as amended by St. 1987, c. 465, § 28) controls in this case.  However, since the 2010 act (St. 2010, c. 239) eliminated the words "mental retardation" from the General Laws and replaced them with "intellectual disability," and did not otherwise amend the statute, we cite to the current statute.  See St. 2010, c. 239, §§ 46-48.

[7] Pursuant to DDS regulations, the formal transfer process begins at the agency level.  DDS initiates that process by requesting the modification of the intellectually disabled individual's individual support plan (ISP) to reflect the proposed change of residence.  See 115 Code Mass. Regs. § 6.25(2)(e) (2009).  DDS subsequently convenes the mandatory individual transition plan (ITP)/ISP modification meeting typically involving, among others, representatives from the ISP and ITP teams at the current residential facility, their counterparts from the potential receiving facility, and the guardians.  See 115 Code Mass. Regs. § 6.25(3)-(4) (2009).  Once

c. 123B, § 3, first par. The first paragraph of the section establishes DDS's general duties to consult with the permanent guardian (or nearest relative) of the individual and to give notice "at least forty-five days prior to the proposed transfer." Ibid.

The second paragraph governs notice, and the section requires DDS to request the consent of the guardians "prior to the transfer . . . from one residential facility for persons with an intellectually disability to another." G. L. c. 123B, § 3, second par. The consent must be requested in writing by registered mail "at least forty-five days prior to the proposed transfer." Ibid. DDS must include certain specific information in the written notice and request for consent to the proposed transfer.[8]

_____

the area or facility director or his or her designee approves the recommended modification, the requested modification becomes final. See 115 Code Mass. Regs. § 6.25(7) (2009). At that point, DDS invokes the transfer statute, seeking the guardians' consent to the proposed transfer pursuant to G. L. c. 123B, § 3, second par.

[8] Pursuant to the statute, the notice of the proposed transfer must include "a statement of how the proposed residential transfer from the current facility to the proposed residential facility will result in improved services and quality of life" for the intellectually disabled individual; specify the location of the proposed facility; include a statement that the guardian may examine the proposed facility and a statement of the legal rights of the guardian under the statute (emphasis added). See G. L. c. 123B, § 3. The regulations further provide that the transfer notice shall "specifically invite the parties to consult with the service

The third paragraph of the section governs the adjudicative process in cases, such as this one, where the guardians timely object to the proposed transfer. The statute authorizes a magistrate to conduct a hearing at the request of DDS in order to determine "whether the transfer should proceed." G. L. c. 123B, § 3, third par. DDS has the burden of a proof at the hearing. Ibid. Within thirty days of that hearing, the hearing officer is required, pursuant to the statute, to issue a written decision determining "which placement meets the best interest of the ward giving due consideration to the objections to the placement made by the relative or permanent guardian" (emphasis added).[9] Ibid.

In this case, the judge read the phrase "which placement meets the best interest of the ward" to necessarily refer to multiple alternatives, "especially if it takes an alternative placement to 'meet the best interest of the ward.'" On that basis, the judge ruled that faced with two flawed choices, DALA should have allowed consideration of additional alternative

coordinator or other designated staff regarding the advantages and disadvantages of the proposed transfer." See 115 Code Mass. Regs. § 6.63(2)(c) (2009).

[9] DDS is also prohibited from acting upon the proposed transfer during the pendency of the hearing; the statute provides twenty days for an appeal to the Superior Court. G. L. c. 123B, § 3, third par.

placements or ordered DDS to consider them.[10]  We disagree with
this interpretation.[11]

We begin, as always, with the text of the statute.  See
Halebian v. Berv, 457 Mass. 620, 628 (2010).  While the
adjective "which" could refer to any number of a group of
alternative placements, the judge's adoption of that meaning

---

[10] The judge suggested several procedures that could be
implemented by DALA to meet its purported statutory duty:  (1)
requiring DDS to submit first and second tier alternatives; (2)
implementation of a phased hearing to allow the parties to
address the question of alternatives after the magistrate's
review of DDS's original rationale; and (3) conditionally
rejecting the proposed WDC transfer pending exploration of
alternatives.  None of these procedures appear in or are implied
from the language of the transfer statute.  See Serrazina v.
Springfield Pub. Schs., 80 Mass. App. Ct. 617, 623 (2011), S.C.,
464 Mass. 1011 (2013), quoting from Carmel Credit Union v.
Bondeson, 55 Mass. App. Ct. 557, 560 (2002) ("we interpret a
statute according to its plain words and will 'not add words to
a statute that the Legislature did not put there'").

[11] In ten recent cases concerning transfers from Fernald
that were appealed to the Superior Court, the judges limited
their review of DALA's best interest analysis to a comparison of
the current FDC residence with the single residential placement
proposed by DDS.  Nine of these Superior Court decisions were
affirmed by this court.  See M.D. v. Department of Developmental
Servs., 83 Mass. App. Ct. 463, 477 (2013); T.K. v. Department of
Developmental Servs., 83 Mass. App. Ct. 1121 (2013); C.T. v.
Department of Developmental Servs., 84 Mass. App. Ct. 1102
(2013); Randall R. v. Department of Developmental Servs., 84
Mass. App. Ct. 1110 (2013) (affirming companion cases); G.R. v.
Department of Developmental Servs., 84 Mass. App. Ct. 791, 808
(2014); M.M. v. Department of Developmental Servs., 84 Mass.
App. Ct. 809, 821 (2014); P.D. v. Department of Developmental
Servs., 84 Mass. App. Ct. 822, 830 (2014); E.G. v. Department of
Developmental Servs., 84 Mass. App. Ct. 831, 837 (2014).  One
decision was reversed on unrelated grounds.  See M.A.K. v.
Department of Developmental Servs., 83 Mass. App. Ct. 906, 906-
908 (2013).

here improperly ignores, in contravention of fundamental tenets of statutory construction, the plain and unambiguous antecedent language.[12]  See Milford v. Boyd, 434 Mass. 754, 759-760 (2001); Wheatley v. Massachusetts Insurers Insolvency Fund, 456 Mass. 594, 601 (2010).  In particular, this interpretation is inconsistent with the process articulated in the second paragraph requiring (1) DDS to propose and to give notice of one alternative placement and (2) guardians opposed to that proposed transfer to object to that placement in writing.  The multiple alternatives interpretation is also undercut by the jurisdictional grant limiting DALA to determining "whether the transfer should proceed" (emphasis added).  G. L. c. 123B, § 3, third par.  Given the Legislature's consistent use of the singular throughout the statute, "transfer" can only be understood to refer to the one residential placement proposed by DDS.

The judge's interpretation also conflicts with the statutory standard as construed by this court to require a comparison of the proposed placement with the existing

_____

[12] When used as an interrogative adjective, the word "which" can be defined as "being what one or ones out of a group; . . . whichever."  Webster's Third New International Dictionary 2603 (1993).  When used as an adjective, "which" has also been defined as "what one of (a certain number or group mentioned or implied)" (emphasis added).  Webster's Unabridged Dictionary (2d ed. 1998).  Similarly when used as a pronoun the meaning is "what one?:  which of these do you want?  Which do you want?"  Ibid.

placement.  See <u>Molly A</u>. v. <u>Commissioner of the Dept. of Mental Retardation</u>, 69 Mass. App. Ct. 267, 277-279 & n.18 (2007); <u>G.R.</u> v. <u>Department of Developmental Servs</u>., 84 Mass. App. Ct. 791, 797 (2014) ("In undertaking this analysis, the magistrate properly compared the proposed services at WDC to the existing services at FDC at the time of the hearing. . . ."); <u>M.M</u>. v. <u>Department of Developmental Servs</u>., 84 Mass. App. Ct. 809, 814 (2014) ("As required by the statutory standard, the magistrate compared the offerings of the two facilities and weighed the benefits of the transfer against the disadvantages").

Read properly as a whole, the transfer statute requires DALA to determine which of the two placements referred to in the second paragraph (current or proposed residential facility) meets the best interest of the intellectually disabled individual.  If DALA concludes that DDS failed to prove that the proposed residential placement will meet the individual's best interest by providing improved services and quality of life, DALA must disapprove the transfer, thereupon ending the formal statutory transfer hearing.[13]  In that case, the intellectually disabled individual will continue to reside at the existing

---

[13] In three FDC transfer cases in which DALA concluded that DDS had not met its burden of proof, DALA followed this procedure.  At the conclusion of those proceedings, DDS began the process again by identifying another placement option for each individual.

facility, and DDS would have to provide a new forty-five day notice prior to beginning any new proposed transfer.

We agree with DDS that the planning stage of the transfer process is the most appropriate time to consider multiple alternative placements.  See M.D. v. Department of Developmental Servs., 83 Mass. App. Ct. 463, 476-477 (2013).  Indeed, the guardians did not "disagree with the notion that alternatives should be considered during the planning process and not at or after the ITP/ISP modification meeting."

Ideally, placement planning is intended to be a cooperative, collaborative process between the guardians and DDS.  The transfer statute anticipates that by the time the parties arrive at an impasse requiring litigation, DDS will have already identified and offered a number of appropriate placement options.  In fact, here the record established that during the planning phase of the placement process, DDS offered the guardians the opportunity to provide input and proposed multiple alternative placements to the guardians, including placements at WDC where openings existed at the time.[14]

---

[14] Placement options offered by DDS included an offer to participate in a group transfer to WDC with other long-term apartment-mates from FDC (an option pursued by many guardians); an offer to keep J.W. at his home at Malone Park to be converted into a group home following FDC's closure; other group homes; and placements at WDC and the Hogan Regional Center (the only two intermediate care facilities for the intellectually disabled [ICFs] to remain open under DDS's consolidation and closure

We have considered the guardians' other claims of error allegedly tainting DALA's decision and find them foreclosed by M.D. v. Department of Developmental Servs., supra, unsupported by the evidence or facts of record,[15] nonprejudicial, or otherwise lacking in merit.

The judge's interpretation of the transfer statute was legally erroneous.  We vacate the judgment and remand the case to the Superior Court for the entry of a new judgment affirming the transfer decision.

So ordered.

---

plan).  The guardians categorically rejected as inferior all State- and vendor-operated group homes offered as well as all alternative placements at WDC and Hogan.

[15] A claim that the guardian was inappropriately excluded from the decision to transfer an individual is not supported by the record where guardians were "encouraged [] to become involved in the placement-planning process, [and] invit[ed] . . . to general informational meetings about placement options and open houses as well as individualized planning meetings." M.M. v. Department of Developmental Servs., 84 Mass. App. Ct. at 819-820.